Lynda BROOKS; Verna Hobson; Geraldine Bavaro; Harriet Eaton; Jane Doe; and Richard Doe, as parents and guardians of, respectively, Michael Brooks; Theresa Hobson; Lisa Bavaro; Jill Eaton; Joe Doe; and Rachel Roe, Plaintiffs,

v.

George E. PATAKI, as Governor of the State of New York; Rudolph W. Giuliani, as Mayor of the City of New York; Thomas A. Maul; Joel A. Dvoskin; Mary Glass; Marva Livingston Hammons, as Commissioners of, respectively, the New York State Office of Mental Retardation and Developmental Disabilities; the New York State Office of Mental Health; the New York State Department of Social Services, and the New York City Human Resources Administration, Child Welfare Administration; and New York City, Defendants.

Civil A. No. CV–95–2902 (DGT).

United States District Court,
E.D. New York.

Nov. 16, 1995.

William J. Burke, Burke and Stone, New York City, Lisa Klee Friedman, New York City, and Robert M. Freedman, Freedman and Fish, New York City, for Plaintiffs.

Michael Prieto, New York City, for Proposed Intervening Plaintiffs.

Thomas E. Coval, Clover & Coval, Willow Grove, PA, for Woods Services [not a party].

Amy Abramowitz, Assistant Attorney General, NYS Department of Law, New York City, for the State Defendants.

Paul R. Kietzman, Alan M. Adler, New York State Office of Mental Retardation and Developmental Disabilities, Albany, NY, and Bruce Rosenbaum, Assistant Corporation Counsel, New York City Law Department, New York City, for the City Defendants.

*MEMORANDUM AND ORDER*

TRAGER, District Judge:

This case concerns the care and treatment of about fifty profoundly disabled and medically fragile individuals whose rights under the federal Constitution have been gravely imperiled as the result of an unfortunate funding dispute between the City and the State of New York.

### Background

The present action has been brought by eighteen of these individuals and eight others who seek to intervene. *Shafran–Torres v. Pataki*, 95–CV–3803. Plaintiffs and intervenors are severely disabled individuals with multiple handicaps. By way of example, one is a twenty-six year old woman who has epilepsy and an IQ of about 70–72 as well as other disabilities. Tr. at 151. Another is a twenty-five year old, profoundly retarded,

non-verbal woman. Pltf.Mot., Bavaro Aff. Seven of the eight proposed intervenors are profoundly autistic and pose potential danger, certainly, to themselves and, possibly, to others. *Shafran–Torres,* Compl. ¶ 57. All of the plaintiffs were originally placed in out-of-state residential care as children by New York City school and social service agencies, with the approval of the State Education Department, because no adequate programs or placements were available in New York. Educ.L. § 4401 & *see* McKinney's Commentary to Educ.L. § 4402, note 102. They remained in those placements even after they reached twenty-one, when the State's obligations to them under federal law expired. Their expenses were then paid under a formula in which localities were reimbursed by the State for fifty percent of the costs of continued placement. They now range in age from twenty-three to thirty-four.[1]

This dispute arose out of the City of New York's (the City) frustration with the State's failure to assume full funding of this service, the residential placement of severely disabled adults, that is ordinarily solely a State responsibility and that will be a State responsibility once the plaintiffs are placed appropriately in New York. This frustration plus budgetary pressure led the City to withdraw from the program under which it paid fifty percent of the costs of these individuals' care.

In addition to this litigation, two suits litigated in state court relate to this matter. In *New York Council for Exceptional People v. Pataki,* ("*NYCEP*"), No. 102684/95 (Sup.Ct.N.Y.County), the parties are essentially the same as in this litigation.[2] There plaintiffs sought a declaratory judgment forbidding the City from withdrawing from the program under which it provided partial funding. In *City of New York v. Webb,* No. 40313/86 (Sup.Ct.N.Y.County), the City sued the State to recover the costs it incurred due to the State's failure to provide residential placements for City-referred individuals. Although plaintiffs in the present action were not parties to *Webb,* they were among those referred and, presumably, the amount assessed against the State in that action included the City's costs for their care over the period covered by the suit. *NYCEP* Appellants' Record on Appeal, 5/17/95 Rosenbaum Affirm. ¶ 5 at 135.

## A. Statutory History of Transitional Care Funding (TCF)

Transitional Care Funding for residential placement of disabled individuals who have "aged out" of educational placements was first included in the State budget in 1982, as a part of the Aid to Localities Budget. From April 1982 to July 1995, the State budget provided fifty percent reimbursement of local expenses for care of mentally and developmentally disabled adults who as children had been placed in residential schools and institutions by local school districts. The Legislative History for the TCF statute noted: "New York assumed continued responsibility for [the] care [of children in residential care who had become twenty-one years old] until alternative programs could be identified, through enactment of appropriation authority to reimburse local social services district payments for transitional care." 1994 N.Y.Laws Ch. 600, Legislative History: Assembly Mem., City Mot.Ex. D at 000011. There was, however, no corresponding authority for transitional care in substantive law until the Transitional Care Statute was enacted in 1994. *Id.* at 000010. Costs increased from "$350,000 [in 1982] to a projected $26 million in the 1993–94 State fiscal year." *Id.* at

---

**1.** This data was provided for the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") clients only, in the attachment to the NYC–OMRDD Memorandum of Understanding, 1/31/95, attached to City's Motion to Dismiss, Ex. C. Eight named plaintiffs are Office of Mental Health ("OMH") clients. Their ages are unknown, except for two about whom testimony was provided at the 9/10/95 hearing. They are 29 and 26. Tr. at 119 and 150.

**2.** The City asserted and plaintiffs did not contest that the *Brooks* plaintiffs and *NYCEP* plaintiffs are identical. Only one plaintiff here was not a named plaintiff in *NYCEP,* and she is a leader in the NYCEP organization. City Mem. at 13–14.

000011.[3]

In 1994, legislation was adopted increasing the State's share of transitional care costs to sixty percent, as of July 1, 1995, and establishing a timetable for the phase out of transitional care to eliminate intake to TCF in 1996 and provide for full state funding as of 1999. 1994 N.Y.Laws, Ch. 600. The Legislative History of the TCF Statute stated the justification for removing persons from out-of-state adult (non-child care) placements as: 1.) lack of "systemic procedures for monitoring the care and services provided by out-of-State facilities so as to protect the health and safety of these young adults;" 2.) reduced opportunities for maintaining family and community ties; and 3.) "out-of-state facilities may or may not have the authority or capacity to care for young adults properly." 1994 N.Y.Laws, Ch. 600, Legislative History: Assembly Mem., City Mot.Ex. D at 000012. The statute permitted discontinuation of transitional funding only after "an appropriate, available adult placement or adult services" was offered and, if not accepted, had been upheld as appropriate by an administrative hearing or the period in which to request administrative review had expired. *Id.* § 466–5(a).

### B. *Related Litigation*

In 1985, the City filed suit against the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD) for its "alleged failure ... to plan for, develop and provide beds to mentally retarded and/or developmentally disabled persons referred by the [City]." *City of New York v. Webb,* No. 40313/86 (Sup.Ct.N.Y.County).[4] In 1991, *Webb* was settled under a court-ordered stipulation of the parties in which OMRDD undertook to place a minimum of 200 individuals annually from a list of 250 City priority placements, to provide written explanations of any failure to place within twenty-four months of referral, and to place all referrals within thirty months of referral. City Mot., Ex. E.[5]

All plaintiffs in the present action for whom OMRDD is responsible were "priority referrals by the City to be placed under the *Webb* stipulation and who either have not been offered a placement by OMRDD or are challenging their offer of placement through the State's appeal procedure." *NYCEP* Appellants' Record on Appeal, 5/17/95 Rosenbaum Affirm. ¶ 5 at 135.

In May 1994, the City filed a contempt motion against the State for its failure to comply with the *Webb* stipulation and order. In October 1995, Judge Collazo, while declining to hold the State in contempt for reasons of policy, directed OMRDD to reimburse New York City's Child Welfare Administration (CWA) $8,500,000 and New York City Health & Hospitals Corporation (HHC) $572,500 for costs incurred through OMRDD's failure to place priority referrals within thirty months. *N.Y.L.J.* 10/27/95, p. 31, col. 2.

The intervenors were not parties to the *NYCEP* litigation in state court.

**3.** Over the years, delays in passage of the state budget beyond the beginning of the State Fiscal Year on April 1 likely created funding gaps. *The New York Times* noted, on July 18, 1993, that "the state budget has not actually been passed before the [April 1] deadline for the last nine years." Sec. 1, p. 32, col. 1. The budget was more than two months late in both 1991 and 1994.

During this period, localities pressed for 100% assumption of transitional care funding by the State and for more rapid transfer of clients from educational placements to State facilities where care was completely State-funded. For instance, Suffolk County announced its intention to withdraw from transitional funding in fiscal years 1990 and 1991. *Newsday,* 10/30/90, p. 53. Paul Vitello, a Newsday reporter, characterized the effort as "a game of chicken: to see who flinches first. The county expects the state to flinch. The county commissioner of social services, Ruth Brandwein said as much last week: 'Hopefully, this will put pressure on the state,' she said, 'to pay 100 percent of the costs.'" *Newsday,* 11/1/89, p. 6. In the end, it was the County that folded.

**4.** Subsequently, Commissioner Maul was substituted as the defendant for former Commissioner Webb.

**5.** There were originally 108 OMRDD TCF clients and an unknown number of OMH TCF clients. The 108 OMRDD TCF clients had been reduced to about 50 by June 1995. *NYCEP,* No. 102684/95 at 3 (Sup.Ct.N.Y.County 6/13/95).

### C. *City's Withdrawal from TCF*

Notwithstanding the increase in the State's share of the costs from fifty to sixty percent, and its commitment to full funding by 1999, the City, in October 1994, notified the State that it would stop funding TCF after December 31, 1994. City Mem. at 6. On December 7, 1994, New York City's Human Resources Administration (HRA) wrote care-giving institutions and parents/guardians advising them of the City's withdrawal from the TCF program. The letter told the parents/guardians that: "CWA will assist [OMRDD] in facilitating the transfer of all young adults out of Transitional Funding.... Please be assured that New York City looks forward to working with you in planning for a *smooth transition* for your family member." Compl. ¶ 69 (quoting Kathryn Croft, Exec. Dep. Comm., NYC HRA, 12/7/94 Letter) (emphasis added). Despite this assurance, at the same time, Commissioner Croft also notified the care givers that the City's withdrawal from funding TCF would occur in only three and one-half weeks, as of December 31, 1994. On December 30, 1994, one day prior to the expiration of its initial cut-off date, the City agreed to provide funds for TCF "... until June 30, 1995 or until the City's budgetary allocation of $1.116 million ran out, whichever occurred first." City Mem. at 6. The City sent mailgrams to parents/guardians on December 30, 1994, notifying them of continued funding for a limited period. Croft Mem., dated 5/30/95.

On January 31, 1995, the City and OMRDD entered into a Memorandum of Understanding (MOU) in which the City agreed, as it had promised on December 30, 1994, to allocate up to $1.116 million to permit the program to continue until the sooner of funds exhaustion or June 30, 1995.

### D. *State Transition Process*

On or about January 11, 1995, OMRDD wrote the parents/guardians, offering an alternate placement to each OMRDD beneficiary and informing them that the City had agreed to fund TCF for a limited period. It offered, in addition to details about a proposed placement, an opportunity for administrative review of the recommended alternative placement. Am.Compl. ¶ 72–73.

The Office of Mental Health (OMH) entered the placement process, however, only on February 27, 1995, when it sent a letter to parents/guardians informing them that the City would provide continued payments for a limited period. This letter [6] also stated that "the state legislature enacted a law (Chapter 600, Laws of 1994) which requires the Transitional Funding Program be phased-out entirely." [7] Pltf.Ex. 7G.

The OMH letter outlined a four step process for placement in OMH operated or licensed programs:

1. OMH staff or its case management agency would interview and evaluate each individual prior to identification of an appropriate residential program.

2. The client and client advocate were to visit the proposed program, with refusal to visit constituting rejection of placement.

3. Following the visit(s), OMH was to send a "Placement Determination Letter" specifying the placement determined to be appropriate, including a description of the program, services, program contact, and proposed transfer date. This letter was to trigger administrative review procedures.

4. Upon expiration of thirty days without a request for an administrative review or upon affirmation of the placement as the result of administrative review, TCF funding was to end upon the transfer date.

---

**6.** Pltf.Ex. 7G, OMH Ltr. dated 2/27/95, Ethel Davis Jackson, Assoc. Comm. For Adult Services to Harriet Eaton. Inexplicably, the letter states that OMH was notified that the City would withdraw its funding on December 14, 1994, nearly two months after the City informed the State of its intended withdrawal and a week after care givers and parents/guardians had been notified by the City. OMH does not appear to have notified either parents or care givers prior to this date of the resumption of funding for a limited period.

**7.** It should be noted that this is a substantial overstatement of the impact of the TCF Statute; it phased out only *new* TCF placements in 1996 and provided for full phase out (subject to State emergency override) only in 1999.

The letter concluded: "Please be assured that the New York State Office of Mental Health is committed to providing *smooth transfers* to appropriate mental health programs." Am.Compl. ¶ 75–77 (emphasis added).

In conformance with their announced procedures, the City and State arranged transition for many OMRDD TCF clients prior to the cessation of funding by the City. For approximately fifty-eight of the 108 OMRDD clients this resulted in transfer from TCF to in-state placements prior to June 1, 1995.[8] It is not clear how many, if any, of the unknown number of OMH TCF clients have been transferred. The Amended Complaint alleges that: "[from February 27 through May 31, 1995] OMH showed proposed facilities but did not proceed to nomination or hearing." Am.Compl. ¶ 78(c).

E.  *City's Termination of Funding on June 1, 1995*

On May 30, 1995, New York City notified the TCF parents/guardians that the TCF funding would cease, effective two days later, on June 1, 1995. Pltf.Mot.Ex. 5. Judge Freedman's order denying plaintiffs' request for a preliminary injunction was issued on June 13, 1995. The Appellate Division, First Department, declined to consider an expedited appeal on June 30, 1995.

F.  *Plaintiffs' State Court Challenge to the City's and State's Right to Discontinue TCF under State Law*

Plaintiffs in the present proceeding filed an action in state court in early 1995, appar-

ently originally as an Article 78 appeal from adverse results in the administrative hearings held by OMRDD following its placement proposals. *NYCEP*, No. 102684/95 (Sup.Ct. N.Y. County 6/13/95). At the end of February, these litigants requested a declaratory judgment that, under the TCF statute, the City and State could not withdraw from funding TCF.[9] This arm of the litigation was decided against the plaintiffs by Justice Helen Freedman on June 13, 1995. *Id.* In October, her decision was affirmed by the Appellate Division, First Department, —— A.D.2d ——, 632 N.Y.S.2d 531.

G.  *The State's Notices to Plaintiffs Following Announcement of the City's Planned Cessation of TCF Funding*

The City and State provided what can be fairly described as abrupt and ambiguous notifications to parents/guardians concerning the City's planned cessation of funding. At the end of 1994, the City's letter announcing the end of TCF funding was provided on short notice [10] and was followed by an eleventh hour notice that funds were in fact still available. The period for which the City extended funding was defined in an indeterminate manner—the exhaustion of a sum of money or June 30, 1995, whichever was earlier. It thus provided little warning that funds would actually run out on May 31. This history of the City–State dispute over funding, followed by temporary resolutions, seems to have lulled not only care givers and parents, but also OMRDD and OMH, into

8.  *NYCEP*, No. 102684/95 at 3 (Sup.Ct.N.Y.County 6/13/95).

9.  In view of subsequent events, the State's initial response to the *NYCEP* suit was, to put a favorable spin on it, ironic. It included the assertions that "a declaratory judgment concerning a potential funding gap should not be permitted because it is (a) premature and thus not a justiciable controversy ..." and "because OMRDD is presently seeking to place the individuals, including petitioners, now receiving that funding in appropriate in-state facilities prior to [June 30, 1995], the 'potential funding gap' may never occur." State Mem. of Law at 2, 6.

10.  For instance, the first notice to care givers and parents of the original date of City fund cutoff, December 31, 1994, although announced

to the State on October 25, 1994, was given by the City on December 7, 1994. As previously noted, on December 30, 1994, the City sent a mailgram to notify care givers and parents that a temporary extension had been arranged.

On January 11, 1995, OMRDD sent letters offering alternate placements and describing the process to be followed. OMH first corresponded with its clients on February 27, 1995, more than four months after the City's announcement of its intent to withdraw.

With respect to the actual end of City funding, the first notice appears to have been the City's May 30, 1995 notice that funding expired the next day, on May 31, 1995.

the belief that the City's intention to end TCF funding was an idle threat, comparable to budget delays from 1982–1993.

As noted, OMH's first notification to parents/guardians of transition plans occurred four months *after* the City informed the State of its intended withdrawal from TCF. OMH, moreover, provided parents/guardians with a misleading description of the TCF statute.[11] Pltf.Mot.Ex. 7G. OMH then proceeded very slowly to identify potential placements and indicated that its consultants, not plaintiffs, were to arrange visits. The testimony of the parents/guardians described OMH's total failure to even nominate any alternate, available placement for their children prior to the cessation of funding. Tr. at 159–60, 134, 185–88.

A final communication subsequent to the cessation of City funding was a June 27, 1995 letter from Governor Pataki to a TCF recipient's parents. It is indicative of the conflicting messages that were sent to parents/guardians by State officials. The letter stated:

> The primary goal of the legislation is to provide appropriate services to children and young adults in New York State rather than in out-of-state placements. To this end, individuals who have aged out, or will soon age out, of their child care or educational placements are to be offered appropriate placements, assimilating into the adult care system operated by the Office of Mental Retardation and Developmental Disabilities (OMRDD) in New York State.
>
> My staff has conferred with Commissioner Maul on this issue, and I am confident that OMRDD is sensitive to each individual's circumstances and needs. Individuals and their families may also benefit from the due process hearing procedures which provide a more formal opportunity to express their concerns over the proposed placements.

**11.** *See* note 7.

**12.** *NYCEP,* No. 102684/95 (Sup.Ct. 6/13/95), *aff'd,* —— A.D.2d ——, 632 N.Y.S.2d 531 (App. Div. 1st Dep't 1995).

**13.** Proposed intervenors in this suit submitted an affidavit from Joseph Assalone, a staff member at

Pltf.Mot.Ex. 2, Ltr. dated 6/27/95 Pataki to Resnicks. Despite the Governor's statement, which presumably was based on information provided to him by OMRDD Commissioner Maul or his staff, that "due process hearings" would be provided, only two weeks later OMRDD notified TCF parents/guardians that it had eliminated these due process hearings. Pltf.Mot.Ex. 4, Ltr. dated 7/13/95 OMRDD Assoc. Comm. Walsh to Brooks.

### H. *Events Subsequent to City's Cessation of TCF Funding*

Following Judge Freedman's determination that the City was entitled to withdraw from funding its portion of the TCF program (and the refusal of the Appellate Division to hear the appeal on an expedited basis),[12] the State took precipitate action. The State attempted to transfer some of these deeply disabled individuals from long-standing State-approved out-of-state placements over a holiday weekend without permission from or even effective notification to their parents/guardians. Although OMH had previously written to these parents/guardians that transfers would be preceded by a visit to the facility by the client and by the parents/guardians, and that an administrative review process would be available, this procedure was not observed.

On Friday, June 30, 1995, OMH staff told one facility that buses would arrive on Monday, July 3, to take some of the plaintiffs to facilities in New York. Tr. at 120–30, 141–43, 152–57, 166, 171–76, 178–82, 189–90. Only prompt intervention by the facility staff and concerned parents/guardians prevented the buses from carrying plaintiffs away from a facility which had been their home for years to an unknown facility over the holiday weekend. This intervention obtained, first, a delay from Monday, July 3, to Friday, July 7, and, finally, cancellation of the planned move.[13]

the Judge Rotenberg Educational Center (JRC), describing another OMH "raid" over the July 4th weekend, involving a notice from OMH to a disabled student—but not the student's parent— received on July 5, 1995, informing him that he would be transported to the Elmira Psychiatric Center on July 7, 1995. Assalone contacted the student's father who stated that he had not given

Later in July, several parents/guardians visited a proposed transfer site in Utica, approximately four and one-half hours from New York City. Tr. at 130. One was told that placement there would be temporary only and that a permanent placement had not been determined. Tr. at 132, 164. The staff at the proposed transfer sites, although described by a parent as "pleasant," demonstrated ignorance about the nature of the plaintiffs' disabilities. Tr. at 131–32. For example, a parent brought to the attention of the OMH staff at the site that his daughter's disability was not primarily psychiatric. Upon review, the State apparently agreed and, in August 1995, State responsibility for this plaintiff was transferred from OMH to OMRDD. Tr. at 161–62. Another parent reported that the staff member designated as her contact "had no awareness that [plaintiff] had a language problem." Tr. at 132.

As part of the events of the Fourth of July weekend, the State gave plaintiffs notice that no further funding would be provided for the current placements and that "the cost of remaining in your current placement would become the responsibility of you and your family." Ethel Davis Jackson, OMH Assoc. Comm. for Adult Community Services Ltr. dated 6/30/95 to Harriet Eaton, Pltf.Mot.Ex. 3. In July and August, the State also notified parents/guardians that it was eliminating the administrative appeal process formerly provided. Pltf.Mot.Ex. 4, James M. Walsh, Assoc. Comm., OMRDD Ltr. dated 7/13/95. Lewis D. Campbell, OMH Dir. Bureau of Special Projects, Ltr. dated 8/1/95, Am. Complt. ¶ 93–94. Informal discussions with the Office's staff were offered as a replacement.

Moreover, as of November 1995, efforts have broken down to arrive at an interim settlement (announced in September 1995) in which the State would at least have paid care-providers the sixty percent share that it would otherwise have paid as reimbursement to the City had the City not withdrawn.

### Discussion

### (1)

### Plaintiffs' Out-of-State Placements Result from State Action

■ These plaintiffs, like those in the Suffolk Developmental Center addressed by the Court of Appeals for the Second Circuit in *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (1984), "are entitled to safe conditions and freedom from undue bodily restraint." The plaintiffs are not in State-operated institutions; and the State asserts that it has no custody of them and no entitlement is involved here. Yet, the State has been intimately involved in their institutionalization from the time it gave its approval when plaintiffs were children and has provided subsidies for their original placements in out-of-state residential care ever since. In many instances, the State is de facto, if not de jure, guardian of the plaintiffs.[14] Institutionalization of the plaintiffs qualifies as state action for § 1983 purposes under the "close nexus test" where the State " 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government].' " *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

OMH his consent and did not wish his son to leave.

    Assalone then contacted Lewis Campbell of OMH to inform him that he did not have parental consent for the student's release. "Mr. Campbell (sic) told me that the funding ended on June 30, and [the student's father] would be responsible to pay if [student] remained at JRC. Mr. Campbell told me that people were on their way to JRC but he would contact them and tell them not to come.... At approximately 8:15 am on July 7, two representatives from the Elmira Psychiatric Center came to JRC in a police car.... They ... gave me a letter from Bert Pyle, Jr. from Elmira. The letter directed us to release [student]." Assalone Aff.

14. Plaintiffs are all adults, some of whom are represented in this action by their parents, but at least one of whom is "represented" by a relative who did not have legal authority even when the plaintiff was a minor. This witness manages the affairs of her "half first cousin" but has no court order. Tr. at 171, 182.

It was the State's failure to promptly place adults (or to return them home—assuming there was no entitlement to care and that such an alternative was even feasible) as they aged out of child placements that gave rise to the TCF program.[15] In a collateral matter in state court, Justice Salvador Collazo has held the State liable for nearly $9 million for its failure to fulfill its commitment to place 200 mentally retarded City citizens per year in long term residential care. *City of N.Y. v. Maul*, N.Y.L.J. 10/27/95, p. 31, col. 2 (Sup.Ct.N.Y.County).[16] Plaintiffs are among those City citizens that the State has failed to place. *NYCEP* Appellants' Record on Appeal, Rosenbaum Affirm., dated 5/17/95 ¶ 5 at 135.

The complexity and variations of the funding relationships over the period between 1982–1995 should not be permitted to obscure the primacy of the State's role in the out-of-state residential placement of severely retarded and mentally ill adults. During the entire period, the State, not the City, has had the responsibility for approving out-of-state placements and monitoring out-of-state facilities. For instance, Ms. Friedman, co-counsel for plaintiffs, stated, without objection from the State or City, that the out-of-state placements were arranged only after parents took their "papers from the Board of Ed. . . . to send them to the regional director in the State Education Department for approving before funding would ever start." Tr. at 45. Further, such placements could be considered only after "there were five in-state rejections for a residential school." *Id.* Ms. Friedman continued: "[T]he state education system didn't have anything, the local education system didn't have anything, and once they aged out there was no place for these people to go after twenty-one in-state." *Id.* at 46.

The TCF program was developed as a stopgap measure to bridge the State's persis-tent inability to find appropriate in-state placements and timely place persons in the adult care system who had been placed in out-of-state residential programs as children. In her memorandum to the Governor's Counsel, Elizabeth Moore, dated 7/21/94, City Mot.Ex. D at 000028, recommending approval of the TCF statute, Susan V. Demers, Deputy Commissioner and General Counsel, Department of Social Services, wrote: "Transitional care originally developed to deal with the problems of persons in residential schools and residential child care facilities who reached the age of 21, who needed placements in OMH or OMRDD adult care facilities but for whom no such placements were available." *Id.* at 4/000031. Consequently, the State had a determinative role in placing these individuals in the out-of-state facilities and, through its responsibility for locating appropriate in-state placements for them, had a determinative role in their remaining in out-of-state placement when TCF funding terminated.

### (2)

### Due Process

**A. *Constitution Requires Exercise of Professional Judgment***

■ In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court stated that, to determine the minimum constitutional standard applicable to persons confined (for non-penal reasons) in an institution as the result of state action requires ascertaining whether "professional judgment in fact was exercised." *Id.* at 321, 102 S.Ct. at 2461. This does not mean, contrary to plaintiffs' assertion, that transfer may be justified *only* where "independent medical judgment indicates the necessity of a transfer." Am.Compl. ¶ 57. *Youngberg* establishes the constitutional standard with which the State must comply—provision of

---

**15.** The memo from Susan Demers, General Counsel & Deputy Commissioner of the Department of Social Services, to Elizabeth D. Moore, Counsel to the Governor, dated 7/21/94, concerning the TCF bill, acknowledges the primacy of the State role: "[The bill] would result in the costs of care for persons in transitional care being paid through the State rather than continuing to be a charge on the social services districts.

*Such a transfer is equitable because social services districts have no legal authority over these adults."* N.Y.C.Mot.Ex. D at 000031–32 (emphasis added).

**16.** Maul replaced Webb as Commissioner of OMRDD.

necessary safe conditions and freedom from undue restraint determined by the exercise of professional judgment. *Id.* at 319, 102 S.Ct. at 2459–60. This standard was further elaborated by the Court of Appeals for the Second Circuit in *Good Will,* 737 F.2d at 1250:

> [D]eprivation [of mentally retarded residents' liberty interest in a humane and decent existence] exists when institution officials fail to exercise professional judgment in devising programs that seek to allow patients to live as humanely and decently as when they entered the school, i.e., when there is no individually oriented, professionally devised program to help ... residents maintain the fundamental self-care skills with which they entered the Center.

■ In *Youngberg,* the Supreme Court acknowledged that: "[A] State necessarily has considerable discretion in determining the nature and scope of its responsibilities." 457 U.S. at 317, 102 S.Ct. at 2459. However, here, the State has not decided, for reasons of "economy, efficiency and expedition," *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 800, 100 S.Ct. 2467, 2483, 65 L.Ed.2d 506 (1980), to cease providing residential placement for severely disabled adults. That legislative decision would be comparable to the District of Columbia's elimination of free homeless shelters for men in *Williams v. Barry,* 708 F.2d 789 (D.C.Cir. 1983), for which a "particularized notice detailing the reasons for the proposed closing and a reasonable opportunity to prepare and submit written responses to the Proposal," *id.* at 790–91, was held to provide "the homeless men all the process they are due." [17] *Id.* at 792. Here, however, despite the formalis-

tic abjuration of responsibility in the TCF Statute,[18] in fact, the State accepts the necessity for residential placement for these plaintiffs and, had it fulfilled its obligation to locate appropriate in-state placements in a timely manner, it would have accepted financial responsibility for them.[19] Consequently, just as the state actors in *Good Will* had a constitutional obligation to provide their residents a humane and decent existence, so, too, in this action the State is obligated to exercise professional judgment to find, and professionally plan transition to, suitable facilities for the individuals still in out-of-state placements.

B. *Absence of Professional Judgment in Transition Arrangement*

The procedure followed by the State was manifestly unprofessional. The actions of State officials on the weekend of July 4, 1995 did not approach the minimal standard necessary to assure appropriate safe conditions for the plaintiffs. State action would have uprooted some plaintiffs to temporary placements in New York where their disabilities were poorly understood with no indication of where their ultimate placements would be or how long they would be in these "temporary" locations. State action now leaves them in limbo without funding for their present placement and without any process for an orderly transition, let alone the "smooth transition" repeatedly promised by State and City officials.

Moreover, the "process" pursued in early July by OMH was at variance with the process it previously announced that it would follow; the "process" was also at variance with the procedures provided in state legislation.[20] The transfer procedure of the Fourth

---

**17.** It may be noted that the District of Columbia proposed to terminate its homeless shelter service in May, not in January. Had the proposed closure threatened the shelter's residents with extreme weather, it is possible that, in view of the more serious harm thus threatened, due process would have required a transition designed to minimize physical harm to the persons affected.

**18.** 1994 N.Y.Laws Ch. 600 § 16.

**19.** The State's long term intent and commitment with regard to plaintiffs here also distinguishes these circumstances from those in *Williams v.*

*Barry.* There, "the statements and declarations of policy on which the court relied in making this determination [of entitlement] often were qualified and couched in the language of short-term measures." 708 F.2d at 792. Here, the State does not dispute its long-term obligations to these individuals.

**20.** *See supra,* p. 1145. Although, pursuant to *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), this court has no jurisdiction to hear claims against the State *based on state law,* state law may define the process that is due. *Paul v.*

of July weekend—if it can be called a procedure—was an unconstitutional violation of the rights of these individuals that threatened them with irreparable harm. The abrupt cessation of funding for placements without an orderly transition, in violation of the announced procedures of both OMH and OMRDD, continues to threaten plaintiffs with irreparable harm.

The Second Circuit in *Good Will,* 737 F.2d at 1246, following the Supreme Court in *Youngberg,* held that once the State made such individuals "dependent on the state, it was required to [house those voluntary residents] in a manner that would not deprive them of constitutional rights." As I read Judge Meskill's endorsement here of Justice Blackmun's concurrence in *Youngberg,* due process, at a minimum, requires a "do no harm" standard. There is evidence that, if State officials here had succeeded in their plans, the plaintiffs' physical safety as well as the maintenance of their fundamental functional capabilities might well have been endangered. *See* Pltf.Mot.Ex. 7, Septimus & Bavaro Aff.

The actions of the State here with respect to transition might fairly be analogized to a decision of a State or Congress to end support for a dialysis program. Such a program is not an entitlement; there is no custody of the patient for state action purposes; and the program's elimination is within the discretion of a State or Congress. Still, no one would seriously argue that the Due Process Clause does not impose an obligation upon a State or Congress to provide reasonable notice to dialysis recipients before terminating funding for those who have relied on that life-sustaining program, so as to allow them the opportunity to obtain alternate access to treatment. Where, as here, the recipients are not only dependent upon the State, but the State also has made assurances that the transition would be "smooth," it must be estopped from peremptorily removing funding—even if there is no entitlement—without at least following the process it led plaintiffs to expect.

The State's refusal to fund out-of-state placements, in view of its failure to complete placement of all TCF recipients, suggests a perverse game of musical chairs where not one but many persons are left standing when the music stops. The precipitate termination of support for out-of-state placements prior to the State's conclusion of arrangements for suitable placements within the State has left these plaintiffs stranded without financial support and without the means to effectuate an orderly transition to appropriate in-state care.

As Justice Blackmun noted in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155–56, 71 L.Ed.2d 265 (1982) (quoting *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980)):

> Each of our due process cases has recognized, either explicitly or implicitly, that because "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action."

Thus, the fact that state law provisions governing funding of out-of-state placement permit the City to terminate funding does not in turn authorize the State to violate its Constitutional duties to these most vulnerable of citizens.

C. *State Breached its Due Process Obligations*

Having decided that New York State had a due process obligation to the plaintiffs, it may be found to have breached that duty by the following acts:

1.  OMH's almost complete failure to plan any orderly transition for its TCF clients after the City announced its intention to terminate funding in October 1994 and even after the Memorandum of Understanding between the City and the State that moved the date of funding termination to July 1, 1995 (subsequently accelerated to June 1,

*Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). *See also Board of Regents v. Roth,*

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

1995 because of exhaustion of the City's TCF budget);

2. OMH's precipitate actions attempting to transfer plaintiffs over the July 4, 1995 weekend to placements that were not based on minimal professional judgment [21] (the events of the Fourth of July weekend demonstrated an approach in which transfer came first, professional judgment, second); and

3. OMRDD's failure to complete the hearing process that it had announced to the plaintiffs and their parents/guardians. Pltf.Mot.Ex. 4, dated 7/13/95 OMRDD Ltr. Assoc. Comm. Walsh to Brooks.

### D. Due Process Requires Maintaining Present Placement until Review of Proposed Placement Completed

Having established the probability of a finding that the State breached its constitutional duty with respect to the liberty interests of these plaintiffs, the question becomes, what process is due? In *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 797, 100 S.Ct. 2467, 2481–82, 65 L.Ed.2d 506 (1980), Justice Blackmun, writing for the majority, stated:

> Procedural due process seeks to ensure the accurate determination of decisional facts, and informed unbiased exercises of official discretion. To the extent procedural safeguards achieve these ends, they reduce the likelihood that persons will forfeit important interests without sufficient justification.

Here, accurate determination of appropriate placement requires careful review of the plaintiffs' requirements and suitability of proposed placements. Failure to provide such review can lead to the forfeiture of the plaintiffs' interests in humane confinement.

"A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). TCF provided for the maintenance of the individual in existing placement until the State agency responsible nominated an appropriate and available adult care facility to the person and the person's parents/guardians and, subject to strict time limits, provided a formal administrative review process. Pursuant to the binding effect of the state court judgment in *NYCEP* and the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that the Eleventh Amendment prohibited consideration by a federal court of state law claims against the state under pendent jurisdiction), the TCF statute is not directly applicable here. Nonetheless, state law may assist in defining the process that is required.[22] The TCF statutory provisions certainly formed the basis for many State communications with the parents/guardians and led to their expectations that the State would adhere to the procedures it had announced.[23] The TCF statute laid out basic procedural guarantees that were certainly not provided to the OMH plaintiffs and have only partially been provided to the OMRDD plaintiffs.

Because the State owes plaintiffs due process in effectuating the transition, maintenance of the plaintiffs in their present placement until this process has been completed is essential. State respect for plaintiffs' liberty interests will be a sham if the State does not support plaintiffs' present placement while due process review of proposed placements is provided for each individual needing placement. Further, in view of the plaintiffs' allegations that the administrative proceedings were not independent of the agencies, an opportunity for judicial as well as administrative review may also be required.

---

**21.** For example, Mr. Niemi testified concerning OMH's lack of understanding that his daughter's problems were not psychiatric. His testimony was substantiated by the State's subsequent transfer of responsibility for her care from OMH to OMRDD. Tr. at 158–63 and Pltf.Ex. 15 OMH Ltr. 8/31/95 attaching 8/15/95 OMRDD Ltr.

**22.** *See* note 20.

**23.** *See supra,* p. 1145.

### (3)

### Equal Protection

Although the procedural Due Process violations are in themselves sufficient to satisfy the standards for issuance of a preliminary injunction,[24] plaintiffs also raise a significant equal protection issue that should be addressed in subsequent proceedings considering the issuance of a permanent injunction. The State violates guarantees of equal protection when it converts "certain similarly situated claims into dissimilarly situated ones, and then uses this distinction as the basis for its classification. This ... is the very essence of arbitrary state action." *Logan*, 455 U.S. at 442, 102 S.Ct. at 1161 (State agency violated state law by setting the hearing for an employment discrimination claim outside the 120 day conciliation period following the allegedly discriminatory act. The Supreme Court held that the Illinois Supreme Court violated the claimant's equal protection rights when it held that the agency's failure extinguished the claimant's right of action.)

Here the inability of the State to provide treatment in-state resulted in State-approved out-of-state placement for these plaintiffs. The harm suffered by the plaintiffs was the result of earlier state action which failed to provide appropriate placements in-state and then left them stranded in out-of-state placements when the City and then the State discontinued TCF funding. Because of the State's inability to accommodate the plaintiffs in-state, when originally placed and now, and its approval and financing of their out-of-state placements, the State may well be denying plaintiffs equal treatment with respect to others similarly situated but transferred in-state prior to the termination of funding. As in *Logan*, 455 U.S. at 442, 102 S.Ct. at 1161, the State has converted "similarly situated claims into dissimilarly situated ones" and then treated them differently.

Furthermore, the State's insistence on bringing plaintiffs, whose out-of-state placement resulted from state action, to in-state facilities may threaten them with treatment that fails to meet the constitutional standard enunciated in *Good Will*. Such insistence will in fact harm them and will deprive them of hard-won gains achieved in present placements. This also deprives them of the protection the State makes available to persons with similar disabilities placed in-state because of an arbitrary distinction created by the State.

### (4)

### Qualification for a Preliminary Injunction

■ "The purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute." *Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.*, 732 F.2d 1095, 1099 (2d Cir.1984); *see, e.g., JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75 (2d Cir.1990). Plaintiffs have met the well-settled standard for a preliminary injunction:

> The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigating and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

A. *Constitutionality of the State's Actions is Seriously Questioned*

■ The absence of professional judgment in the State's "transfer procedure" and the refusal to establish a payment procedure for care-providers following Justice Freedman's decision demonstrates the existence of "sufficiently serious questions going to the merits" of the alleged constitutional violation to satisfy the first part of the second prong of the standard. This makes a fair ground for litigation with a real possibility for success on the merits. *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir.1977). The balance of hardship certainly tips toward plaintiffs, whose very functioning is threatened, as opposed to the possible incurrence of some

**24.** *See supra*, p. 1144.

incremental cost by the State for out-of-state care rather than in-state care.

## B. *Prospect of Irreparable Harm Is Actual and Imminent*

The appearance by a representative for Woods School has brought to the Court's attention the critical problem faced by the private organizations currently caring for the plaintiffs. Woods School has not been paid since City funding was discontinued in June. Over $200,000 in expenses for plaintiffs have accrued at Woods School in the July through September 1995 period alone.[25] Woods School and the other institutions are now confronted with conflict between their ability to care for these individuals and their duty to protect the financial health of their institutions which directly impacts upon their ability to serve others.

Moreover, the prospect of irreparable harm is "'not remote or speculative but ... actual and imminent.'" *Jackson Dairy, Inc.* at 72 (quoting *New York v. Nuclear Regulatory Comm.,* 550 F.2d 745, 755 (2d Cir.1977)). The harm that will be caused to these severely disabled persons by a hasty transfer as the institutions discharge plaintiffs, which they will inevitably be forced to do because of cessation of funding, certainly cannot be repaired by money damages. The balance of hardships tips unquestionably in the direction of the plaintiffs.

Plaintiffs have made a substantial showing that the State has not offered, and may not soon be able to offer, placements appropriate for many, if not all, of these most severely impaired individuals. In this connection, it is important to note that neither the State nor the City has rebutted the affidavits and testimony offered by plaintiffs describing repeated rejection of plaintiffs by in-state providers recommended by the State.

The State of New York, having assumed responsibility for the care and maintenance of these seriously impaired individuals, is the entity ultimately responsible under the federal Constitution for the accomplishment (or failure) of any transition to adult placements in a manner that satisfies due process standards.[26] As Judge Brieant held in earlier litigation concerned with severely disabled children:

> A disruption of [these] lives, such as that which would be caused by an abrupt change of [facilities], would be likely so to disturb these [individuals] that many skills, acquired after time and great effort, would become unlearned and lost. Many have been transferred before; shuttled from pillar to post ... At least during the pendency of this lawsuit, such irreparable injury ... must be avoided.

*Stanger v. Ambach,* 501 F.Supp. 1237, 1243 (S.D.N.Y.1980).

This concern was echoed in the legislative history for the TCF statute: "the potential for serious disruptions in care for these young adults, who have less tolerance for disruption than most others in our systems of care, remains higher than is warranted." Memorandum of State Executive Department, attached to *NYCEP* Appellants' Record on Appeal, Ex. G.

Therefore, as the circumstances fully satisfy the requirements, a preliminary injunction may be granted.

---

**25.** A tentative interim settlement proposed in September under which the State would have paid its 60% share toward the cost of care, using the City as a conduit, has collapsed.

**26.** The City's role with respect to plaintiffs has been primarily that of fund provider since they entered adult care. *See,* note 15, Demers Mem. ("Such a transfer [of financial responsibility to the State under the TCF statute] is equitable because social services districts have no legal authority over these adults.")

The State litigation has determined that the City was entitled to terminate its participation in the TCF program. *NYCEP,* No. 102684/95 (Sup.Ct.N.Y.County 6/13/95), *aff'd,* ── A.D.2d ──, 632 N.Y.S.2d 531 (App.Div. 1st Dep't 1995). Having failed to raise plaintiffs' constitutional claims regarding the cessation of funding in that litigation which proceeded to a final resolution in New York state courts, pending appeal, plaintiffs are foreclosed from raising them here. *Migra v. Warren City School Dist. Bd. Of Educ.,* 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984) ("Section 1983 ... does not override state preclusion law and guarantee petitioner a right to proceed to judgment in state court on her state claims and then turn to federal court for adjudication of her federal claims.").

## (5)

### Res Judicata Is Not Applicable

The issues and transactions on which this order are based are not the subject of pending or completed state proceedings. *See O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981) (litigation based on acts occurring after the original lawsuit is not barred by res judicata). Federal law looks to the applicable state res judicata principles. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). The claim is based on constitutional violations occurring after the resolution of *NYCEP* in state court.[27] Final resolution of the funding issue in state court (now affirmed by the Appellate Division for the First Department, but still possibly subject to review by the New York Court of Appeals) did not authorize the State to subject plaintiffs to unconstitutional treatment by depriving them of their interest in humane institutionalization without procedural due process.

Furthermore, abstention is not appropriate here because the claim does not involve the interpretation of a novel state statute. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

## (6)

### Concluding Thoughts

This dispute is disheartening. No party seriously questions the necessity of public care for these plaintiffs nor that ultimately care for these plaintiffs will be funded by the State. The money to pay for at least sixty percent of the cost is already in the state budget. The only question is whether the State will pay present out-of-state facilities or only in-state providers. There has been no showing that the State would save any, let alone substantial, money during this transitional phase through its insistence on an abrupt, unseemly, and unprofessional transfer. With respect to the City, in view of Justice Collazo's decision in *Maul*, it appears now that the City is entitled to full reimbursement by the State for costs for plaintiffs' TCF care. Whatever the equities of City's position that the State has failed to meet its commitments, the City's failure, in light of Justice Collazo's decision, to reconsider its refusal to participate in TCF is, at a minimum, difficult to understand. Indeed, whatever the merits of their respective positions in this short-term funding dispute, the actions of both the City and State throughout constitute a shameful, if not cruel "game of [budgetary] chicken" at the expense of those who, by any test, are least able to fend for themselves. The City's and State's actions will certainly disrupt, if not put at risk, the lives of these seriously disabled persons. Responsible public officials can and should do better.

### Conclusion

Plaintiffs' motion for a preliminary injunction is granted in part. The State of New York is hereby ordered to take all necessary steps, including but not limited to payment of out-of-state facilities at which plaintiffs currently reside, to maintain plaintiffs in their present placement until, following evaluation procedures evincing the exercise of professional judgment, in compliance with the standards enunciated in *Youngberg* and *Good Will*, orderly transition to permanent State approved placement is accomplished. Orderly transition is to include the proposal of, and opportunity to visit, appropriate, available, long-term placements plus an opportunity for

---

27. The findings in this opinion are based on the pleadings and on a hearing at which only the plaintiffs presented evidence. Continuation of the hearing was put off based on representations by the City and State defendants that a tentative settlement had been arranged with the plaintiffs. No good explanation has been provided the court for the failure of the settlement effort, particularly, as noted above, in view of the State's existing appropriation for 60% of the costs of the placements plus a portion of the City's costs of administration. TCF Statute, 1994 N.Y.Laws, Ch. 600 § 466; Soc.Serv.L. Art. 8–B. At this point, nearly six months after elimination of TCF funding and the proposal of improper transfers, with the plaintiffs facing imminent discharge from current placements that can no longer afford to provide care gratis, and with no explanation for the failure of the settlement, the State is not free to insist on a right to complete the presentation of its side before any action is taken by the court.

the plaintiffs and their parents/guardians to obtain independent administrative and/or judicial review.

In light of the representations made by the City and the State to this Court, the motion to intervene will be held in abeyance for the present.[28]

SO ORDERED.

---

28. Both the State and the City represented that they generally treat litigants and non-litigants alike upon receipt of a judgment. "Generally the City ... applies court decisions across the board to a group of people even if it isn't a class action." Tr. at 2, Rosenbaum. "... the State would treat everybody the same. We have done so with regard to the State litigation which is not a class action and even though Judge Freedman's decision in State Supreme Court was only binding on a few people, we applied [it] across the board to everyone." Tr. at 3, Adler.