Lynda BROOKS; Verna Hobson; Geraldine Bavaro; Harriet Eaton; Jane Doe; and Richard Doe, as parents and guardians of, respectively, Michael Brooks; Theresa Hobson; Lisa Bavaro; Jill Eaton; John Doe; and Rachel Roe, Plaintiffs–Appellees,

v.

Rudolph W. GIULIANI, as Mayor of the City of New York; Marva Livingston Hammons, as Commissioner of the New York City Human Resources Administration, Child Welfare Administration and New York City, Defendants,

George E. Pataki, as Governor of the State of New York; Thomas A. Maul, as Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities; James L. Stone, as Commissioner of the New York State Office of Mental Health and Brian J. Wing, as acting Commissioner of the New York State Department of Social Services, Defendants–Appellants.

No. 1421, Docket 95–9178.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1996.

Decided May 31, 1996.

Amy L. Abramowitz, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York; Barbara G. Billet, Deputy Solicitor General; Thomas D. Hughes, Assistant Solicitor General, New York City, of counsel), for Defendants–Appellants.

William J. Burke, Burke & Stone, New York City (Lisa K. Friedman, New York City; Robert M. Freedman, Freedman and Fish, New York City, of counsel) for Plaintiffs–Appellees.

(Michael Prieto, New York City), for Susan Shafran–Torres, Edward W. and Ethel B. Chapin, Myron and Lorraine Slaff, Marie Washington, Corine Watson, Carlos Casoria, Marian Nurenberg, Helen Thurman, Mary Dowling, and Roger Leveille, as parents and

guardians of, respectively, David Torres, Bruce Chapin, Mathew Slaff, Jacque Washington, Sean Watson, Janine Casoria, Elly Nurenberg, Ernie Thurman, Antonio Staton, and Loudy Leveille, amici curiae.

(Thomas E. Coval, Clover & Coval, Willow Grove, PA), for Woods Services, as amicus curiae.

Before: WINTER, JACOBS, and PARKER, Circuit Judges.

Judge PARKER dissents in a separate opinion.

JACOBS, Circuit Judge:

The United States District Court for the Eastern District of New York (Trager, *J.*) entered a preliminary injunction requiring, *inter alia,* that New York state agencies pay for certain of its severely disabled citizens (plaintiffs here) to live in out-of-state institutions until such time as the State, employing "evaluation procedures evincing the exercise of professional judgment," achieves the "orderly transition" of these individuals "to permanent State approved placement" within New York. *Brooks v. Pataki,* 908 F.Supp. 1142, 1156 (E.D.N.Y.1995). Given plaintiffs' undisputed contention that "[t]here is no appropriate place in New York available for them," the effect of this injunction is to maintain funding indefinitely for care at the out-of-state institutions.

The same plaintiffs commenced a prior litigation in the New York state courts, unsuccessfully seeking an order that would require the State to pay the same care expenses sought here. That suit was based upon constitutional and statutory arguments as well as an agreement between city and state agencies. The New York court ruled that the State has no funding obligation.

In this subsequent federal action, plaintiffs seek essentially the same relief from the State on federal constitutional grounds. In this expedited appeal, we conclude that the district court erred in issuing the injunction, because several of plaintiffs' claims are barred by *res judicata,* and the remaining claims do not warrant the injunctive relief as ordered.

## BACKGROUND

The eighteen plaintiffs are severely disabled individuals with multiple handicaps who are represented by their parents and guardians. All of the plaintiffs were originally placed as children in out-of-state residential care facilities by the educational and social service agencies of the City of New York, with State approval, because educational placements adequate to their needs were unavailable in-state. The plaintiffs, all of whom are apparently over 21, have now outgrown the educational programs that originally placed them in out-of-state facilities.

When these individuals reached age 21, federal and state education funds by law could no longer be tapped to provide for them. New York City nevertheless continued to pay for residential care at the out-of-state institutions upon determining that suitable adult placements were unavailable in-state. This City-funded care in out-of-state institutions is known as "transitional care," presumably because it was designed to last only until suitable in-state placements could be found. Other counties and localities, for reasons similar to those of New York City, had made comparable out-of-state placements and provided funding for these placements after the affected individuals turned 21. Beginning in 1982, the State reimbursed 50% of the localities' expenditures for these "aged out" individuals by way of an earmarked appropriation within its Aid to Localities Budget. This State budget arrangement, and the reimbursements it afforded, continued until the end of 1994, when the system was modified by legislation. These payments from the State are commonly known as Transitional Care Funding ("TCF"). The State's TCF program in the years 1982–1994 had no legislative authority other than the provision made in the Aid to Localities Budget.

### A. The TCF Statute.

In 1994, New York State enacted a statute, effective January 1, 1995, that undertook to place these arrangements on a different footing (the "TCF Statute"). 1994 N.Y.Laws

600; *id.* § 17 (effective date). Section 3 of the TCF Statute, codified at N.Y.Soc.Serv.L. §§ 466 to 466–b (McKinney Supp.1996), provides for an increase from 50% to 60% in the State's TCF reimbursements to localities in respect of the out-of-state placements; the eventual phase-out of the out-of-state placements; and the State's assumption by 1999 of 100% funding for individuals still left in out-of-state placements.[1] N.Y.Soc.Serv.L. § 466(2), (5), (6). To effect the transition from out-of-state to in-state placements, the statute directs the New York State Office for Mental Retardation and Developmental Disabilities (the "OMRDD") and the New York State Office of Mental Hygiene (the "OMH") to arrange transfers to appropriate in-state adult care facilities, and establishes a system of administrative hearings for challenges that guardians may make concerning the appropriateness of proposed transfers.[2]

As to each individual, TCF payments would end after an appropriate available in-state adult placement is offered and is either (i) accepted, or (ii) rejected by a guardian but thereafter found to be appropriate in an administrative hearing. Before an in-state placement is found, the TCF Statute provides that counties and localities "*may* expend funds to provide transitional care," which "shall be subject to state reimbursement" at the rate of 60%. *Id.* § 466(2) (emphasis added). On or after January 1, 1999, "all expenditures related to transitional care for persons remaining in such care at that time shall become the sole responsibility of" the OMRDD or the OMH, as the case may

be. *Id.* § 466(6). Under this mechanism, the State agencies pay 100% of the *in-state* residential costs (as they did before the enactment of the TCF Statute); reimburse localities for 60% of the *out-of-state* residential costs until 1999; and pay for 100% of the out-of-state placements remaining in 1999.

Section 16 of the TCF Statute categorically disclaims any entitlement:

No provision of this act shall be deemed or construed to create any right, interest, or entitlement for any individual to receive mental hygiene, education or social services funds or services, or placement in a mental hygiene facility, or any other right, interest or entitlement to services, funds or placement.

1994 N.Y. 600 § 16 (codified as a statutory note following N.Y.Soc.Serv.L. § 466).

## B. The Funding Crisis.

Judge Trager accurately characterizes the controversy giving rise to this lawsuit as "an unfortunate funding dispute between the City and the State of New York."[3] 908 F.Supp. at 1143. In October 1994, New York City notified the State that it would stop paying for out-of-state care after December 31, 1994, a step that would thereby release the State from any reimbursement obligation under the TCF Statute. On December 7, 1994, according to plaintiffs' amended complaint, the City's Human Resources Administration (the "HRA") wrote to guardians and the out-of-state residential institutions to advise them of the City's termination of transi-

---

**1.** Legislative history summarized by the district court identifies a number of purposes for the elimination of the out-of-state placements: to assure State monitoring of the residential facilities; to increase the opportunity for clients to maintain their ties with their families and their communities; and to end the State's dependency on out-of-state facilities that may lack the authority or capacity to care for New York's citizens. 908 F.Supp. at 1144–45. The legislative history also notes the increase in reimbursement costs from $350,000 in 1982 to "a projected $26 million in the 1993–94 State fiscal year." *Id.* at 1144.

**2.** Although the City has paid for transitional care, each plaintiff is also a client (for some purposes)

either of the state's OMRDD or OMH, depending apparently on the nature of each plaintiff's impairments.

**3.** The funding and reimbursement arrangements for these out-of-state placements have long been a flash point between New York City and the State government. In 1985, the City sued the OMRDD in the Supreme Court of New York County for failure to provide adequately for mentally retarded and developmentally disabled persons referred by the City. *City of New York v. Webb*, No. 40313/86 (N.Y.Sup.Ct.N.Y.County). The suit ended in a settlement embodied in a court-ordered stipulation in 1991, in which OMRDD undertook the speedy placement of such persons.

tional care.[4] The City told the guardians that the HRA's Child Welfare Administration "will assist [the OMRDD] in facilitating the transfer of all young adults out of Transitional Funding. . . . Please be assured that New York City looks forward to working with you in planning for a smooth transition for your family member." One day before the scheduled funding cut-off, on December 30, 1994, the City partially relented and agreed to provide funds until the earlier of June 30, 1995, or such date as the City's budgetary allocation of $1.116 million was exhausted earlier. This undertaking was recorded in a Memorandum of Understanding, dated January 31, 1995, between the HRA and the OMRDD.

On January 11, 1995, the OMRDD wrote to guardians of its TCF clients, advising that the City would continue payments for a limited time in order to permit TCF recipients to be placed in-state. The OMH sent a similar letter, dated February 27, 1995, informing the guardians that the City would provide transitional care payments for a limited period to facilitate the "orderly transfer of clients *seeking* placements in publicly funded programs operated or licensed by OMH" within New York State. (Emphasis added.) The letter continued, "Clients may, of course, *choose to remain* in their current placement *with the cost becoming the responsibility of the client or family.*" (Emphasis added.) The letter concluded: "Please be assured that [OMH] is committed to providing smooth transfers to appropriate mental health programs."

During the first half of 1995, the OMRDD and the OMH attempted to place TCF recipients in State facilities. Of the 108 OMRDD clients from New York City, 58 accepted in-state placements and were removed from the TCF program by June 1, 1995. It is unclear how many of the unknown number of OMH clients receiving TCF have been similarly placed. It is undisputed, however, that there are no satisfactory in-state placements presently available to accommodate any of the plaintiffs.

### C. The State Litigation.

On February 1, 1995, the New York Council for Exceptional People (an unincorporated association whose members are parents and guardians of TCF recipients) and three of the plaintiffs here (collectively, "NYCEP") filed an Article 78 petition (used to challenge New York State administrative actions) against OMRDD Commissioner Maul. The petition, filed in New York State Supreme Court in the County of New York, alleged that OMRDD was about to eliminate or alter the administrative procedures for effecting in-state placement of TCF recipients, in violation of the TCF Statute, other New York statutes, and the TCF recipients' "constitutional rights to procedural and substantive due process."

Late that month, NYCEP filed a lawsuit in the same court, seeking a declaratory judgment prohibiting the City and State from terminating transitional care. On March 31, 1995, NYCEP filed a "Restated Verified Second Amended Petition" and a "Restated Verified Complaint." NYCEP's new pleadings sought relief that would (1) forbid the City from "withdraw[ing]" from the TCF Program," or (2) require the State to assume 100% funding of transitional care expenses. NYCEP's claims in that lawsuit were based on New York State's constitution, the TCF Statute, and the January 31, 1995 Memorandum of Understanding between the HRA and the OMRDD.

On April 10, 1995, the state court granted judgment in favor of the defendants/respondents in the Article 78 proceeding, except on the due process claims and a statutory challenge, which the plaintiffs/petitioners were permitted to pursue in "post-hearing Article 78 proceedings."[5] The court also severed

---

**4.** Remarkably, this letter is not in the Joint Appendix and apparently was not even in the record before the district court. *See* 908 F.Supp. at 1146 (citing only to the complaint).

**5.** The order also qualified the judgment by providing that (1) no person receiving TCF could be transferred before the appointment and estab-

lishment of an advisory council, as described in the TCF Statute; and (2) at administrative hearings regarding prospective new placements, a TCF recipient may present evidence "with respect to the nature and suitability of his or her current placement."

the "remaining claim for a declaratory judgment as to future funding" from the Article 78 proceeding. *New York Council for Exceptional People v. Pataki,* No. 102684/95 (N.Y.Sup.Ct.N.Y.County April 10, 1995).

Meanwhile, on May 30, 1995, the City notified the guardians that its $1.116 million had run out, and that the City would terminate transitional care on June 1, 1995.

The state court issued a ruling in the declaratory judgment action on June 13, 1995. Justice Freedman held that "neither the TCF Statute, the State constitution, nor the Memorandum of Understanding entitles the client plaintiffs to City or State funding." [6] *New York Council for Exceptional People v. Pataki,* No. 102684/95, slip op. at 9 (N.Y.Sup.Ct.N.Y.County June 13, 1995). The Appellate Division unanimously affirmed in October, —— A.D.2d ——, 632 N.Y.S.2d 531, 531 (1st Dep't 1995); on February 20, 1996, the New York Court of Appeals denied leave to appeal. Mo. No. 14 (N.Y. Feb. 20, 1996) (unpublished slip op.)

Since we conclude that the judgment in the state litigation has substantial *res judicata* effects on most of the claims on which the preliminary injunction in this case is based, we outline the state court decision in some detail. The court described the funding crisis and its potential adverse effects on the plaintiffs as follows:

In drafting the [TCF] Statute, it appears that the State legislature and then Governor Cuomo did not anticipate that a locality would withdraw from the transitional care program that had been in effect since 1982, and thus did not foresee that the Statute's provisions, as set forth in Soc. Serv.Law §§ 466(2) and (6), created a potential funding gap for four years until 1999. The Statute mandates that the State increase its reimbursement from 50% to 60% of locality expenditures as of 1995, and take over direct funding of the TCF Program as of 1999: but a loophole permits the State to expend no monies at

all for the plaintiff clients. A locality's withdrawal form the TCF Program before 1999 results in certain clients being left without any funding source at all, whereas clients still in transitional care as of 1999 are assured State funding. This situation is inconsistent with the overarching funding scheme, which establishes an otherwise orderly plan for phasing out transitional care so as to minimize disruption and hardship to clients, and under which the State assumes an increasing portion of Program costs over time.

Defendants' abrupt cessation of funding may jeopardize the welfare of particularly vulnerable citizens of this State.

*New York Council for Exceptional People v. Pataki,* No. 102684/95, slip op. at 10–11 (N.Y.Sup.Ct.N.Y.County June 13, 1995). The court also summarized plaintiffs' contentions:

Plaintiffs do not concede that the City has a right to withdraw from the TCF Program, but argue that the State is obligated under the Statute to assume responsibility for all TCF Program costs for City residents which the City does not cover. To hold otherwise, plaintiffs claim, would thwart the legislature's intent for the State to assume over time the entire cost of the TCF Program. Plaintiffs point out that from 1982 through 1994, the State had been reimbursing localities for 50% of costs. Under the Statute, the State must now reimburse at a 60% rate, and take over all funding in 1999. Plaintiffs conclude that the Statute is "flexible enough to impose full State responsibility prior to 1999, *or* that the prior 1982–1994 program indicates the intent of coverage if the statute is silent on the issue of premature locality withdrawal." *Plaintiffs' Memorandum of Law* at 8.

*Id.* at 5. In granting the defendants' summary judgment motion and denying the plaintiffs' motion, the state court held:

6. Justice Freedman's opinion does not discuss the due process claims raised by plaintiffs in their Article 78 petition, and we see no indication of a separate disposition in the record. The Article 78 proceeding seems to have been consol-

idated with the declaratory judgment action, since both were identified by the same index number in New York State Supreme Court. The original declaratory judgment complaint is not in the Joint Appendix.

Social Services law § 466(2) provides that localities *may* participate in the TCF Program, for which they will receive *reimbursement* from the State. [Emphasis in original.] The only possible interpretation of this language is that *the localities' participation is voluntary and a condition precedent to any State obligations.* Inasmuch as the City has withdrawn from the TCF Program, there is nothing to reimburse, and accordingly *the State has no current duty to contribute any monies to the client plaintiffs' transitional care.*

In any event, Section 16 of the Statute is dispositive of plaintiffs' motion. That provision unambiguously states that no provision of the statute shall be construed to create for any individual a "right, interest or entitlement to services, funds or placement." In view of this pronouncement, *this Court cannot deem the State to be the guarantor of the client plaintiffs' transitional care funding.*

*Id.* (emphasis added).

### D. The July Fourth Weekend Transfer.

Following the issuance of Justice Freedman's opinion on June 13, 1995, the State made arrangements for the transfer of some of its clients to in-state facilities. One such transfer, scheduled for the Fourth of July weekend, led to an incident that plaintiffs have focused on in their federal litigation. On the Friday preceding the four-day holiday weekend, the OMH advised the Devereux Institute (an out-of-state facility at which some of plaintiffs reside) [7] that buses would arrive on Monday, July 3, to transport nine TCF residents to facilities in Utica and Amsterdam, New York. This arrangement was made without the consent or knowledge of the guardians, who learned of the transfer from the institute and promptly intervened to prevent it. A new transfer date of July 7 was set, but no transfer took place, and the nine plaintiffs have remained at Devereux.

### E. The Federal Litigation.

On July 20, 1995, in the aftermath of these developments, plaintiffs and their guardians commenced this action pursuant to 42 U.S.C. § 1983, against the Governor and the Commissioners of the OMRDD, the OMH, and the State's Department of Social Services (the "State Defendants").[8] The complaint asserts the existence of certain constitutional rights under the Fourteenth Amendment:

19. These rights include, without limitation:

(a) a life interest in continued care, including adequate food, shelter, clothing, and medical care;

(b) a liberty interest in the provision of adequate and appropriate care and treatment, including safe conditions and freedom from undue bodily restraint;

(c) a property interest in the funding of such care;

(d) a due process interest in notice and hearing prior to the removal of rights established by state statute;

(e) an equal protection interest in allocation of funds.

These rights are alleged to have been violated as follows:

20. Those rights were adequately protected by the TCF Program up to October 25, 1994. They have been violated from and after June 1, 1995 as to funding; from and after July 13, 1995 as to denial of hearings, and from and after various earlier dates as to other pleaded acts, or failures to act.

Plaintiffs also alleged that there were no suitable in-state facilities for them:

14. From 1982 to 1994, the New York Legislature and the governors then in office made findings that no facilities appropriate for the Beneficiaries were available within New York State.

15. On information and belief, no new facilities have been constructed, and no existing facilities have been remodeled to meet the special and unique needs of the Beneficiaries.

---

7. The Joint Appendix does not indicate in which state the Devereux Institute is located.

8. Additional parties not part of this expedited appeal—the City of New York and some of its agencies and officials—were also named as defendants.

The complaint alleged four causes of action. On September 15, 1995, plaintiffs filed an amended complaint that added six other claims. Of the ten claims, eight ask for injunctive relief.[9] The first, second, third, and fourth claims allege due process and equal protection violations based on the failure of all of the defendants to continue making TCF payments for plaintiffs after the City discontinued its funding. The fifth and sixth claims are similar, alleging that correspondence sent by the State and the City to the guardians created an obligation for all defendants to provide "orderly placement" and transition following the City's announced discontinuation of funding. The seventh claim is based on the uncompleted transfer over the Fourth of July weekend, alleging a "separate and distinct violation of constitutional rights by OMH." The ninth claim alleges "coercive conduct" by the OMRDD in its unsuccessful attempts to place OMRDD clients. All eight of these claims ask for some form of injunctive relief that would assure immediate, full and retroactive State funding of out-of-state placements, and that would implement the procedural mechanism for in-state transfers set forth in the TCF Statute.

In the first of two published opinions, the district court granted a preliminary injunction ordering the State Defendants to provide full funding immediately for plaintiffs' out-of-state care. 908 F.Supp. 1142, 1156 (E.D.N.Y.1995). First, the court found that the placement of plaintiffs in out-of-state facilities constituted a state action by the State Defendants. *Id.* at 1149–50. Addressing plaintiffs' due process claims, the court decided that "the minimum constitutional standard applicable" to the placement of the plaintiffs "requires ascertaining whether 'professional judgment in fact was exercised.'" *Id.* at 1150 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)). The court reasoned that, since the State "accepts the necessity for residential placement for these plaintiffs," and since plaintiffs would be entitled to State-funded care if they were placed in-state, the State

"is obligated to exercise professional judgment to find, and professionally plan transition to, suitable facilities" for plaintiffs. *Id.* at 1151.

Turning to the actions of State officials in connection with the July Fourth episode, the court found that these actions were "manifestly unprofessional," violated plaintiffs' constitutional rights, and "threatened them with irreparable harm." *Id.* at 1151–52. Further, "[t]he abrupt cessation of funding for placements without an orderly transition, in violation of the announced procedures of both OMH and OMRDD, continues to threaten plaintiffs with irreparable harm." *Id.* at 1152. Relying on *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (2d Cir.1984), the court concluded that:

> Where, as here, the recipients are not only dependent upon the State, but the State also has made assurances [in correspondence] that the transition would be "smooth," it must be *estopped from peremptorily removing funding—even if there is no entitlement—*without at least following the process it led plaintiffs to expect.

908 F.Supp. at 1152 (emphasis added). Accordingly, the court held that due process could only be satisfied if the State provided funding to maintain plaintiffs in their present placements until they could be properly transferred in-state. *Id.* at 1153.

The court also found that plaintiffs had raised "a significant equal protection issue that should be addressed in subsequent proceedings." *Id.* at 1154. Preliminary injunctive relief was appropriate on this ground as well, said the court, because plaintiffs would suffer irreparable harm without the injunction; because their constitutional claims furnished "a fair ground for litigation with a real possibility for success on the merits"; and because the balance of hardships tipped in their favor. *Id.* at 1154–55.

The court rejected the State's *res judicata* defense in the following terms:

---

**9.** The eighth and tenth claims sought damages from Governor Pataki, the OMRDD, and the OMH.

The issues and transactions on which this order are based are not the subject of pending or completed state proceedings. Federal law looks to the applicable state res judicata principles. The claim is based on constitutional violations occurring after the resolution of [the] *NYCEP* [case] in state court. Final resolution of the funding issue in state court (now affirmed by the Appellate Division for the First Department ...) did not authorize the State to subject plaintiffs to unconstitutional treatment by depriving them of their interest in humane institutionalization without procedural due process.

*Id.* at 1156 (citations and footnote omitted). After the State renewed its argument that the claims underlying the injunction are barred by *res judicata,* the court rejected the argument again, in a second opinion issued on December 4, 1995:

This court continues to disagree, holding that the State's precipitate actions following the end of TCF in June 1995 inflicted new constitutional injury upon the plaintiffs that could not have been raised in litigation concluded prior to its occurrence. Final resolution of the funding issue in state court (now affirmed by the Appellate Division for the First Department ... ) did not authorize the State to subject plaintiffs to unconstitutional treatment by depriving them of their interest in humane institutionalization without procedural due process.

908 F.Supp. 1157, 1162 (E.D.N.Y.1995). Relying on *Balderman v. U.S. Veterans Admin.,* 870 F.2d 57, 62 (2d Cir.1989), the court held that these plaintiffs could not have litigated "abrupt unreviewed transfers by the State until the State actually undertook such action" after the state litigation was concluded. 908 F.Supp. at 1162.

The injunction, as revised by the second opinion, ordered the State defendants

to take all necessary steps, including but not limited to payment of out-of-state facilities at which plaintiffs currently reside, to maintain plaintiffs in their present placement until, following evaluation procedures evincing the exercise of professional judgment, in compliance with the

standards enunciated in *Youngberg* and *Good Will,* orderly transition to permanent State approved placement is accomplished. Orderly transition is to include the proposal of, and opportunity to visit, appropriate, available, long-term placements plus an opportunity for the plaintiffs and their parents/guardians to obtain independent administrative and/or judicial review.

*Id.* at 1165.

## DISCUSSION

 A motion for a preliminary injunction should not be granted unless the movant demonstrates (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) "sufficiently serious questions" on the merits and a balance of hardships "tipping decidedly" in the movant's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). We review for abuse of discretion the district court's grant of the preliminary injunction. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994). An injunction issued on the basis of an error in law is one example of an abuse of discretion. *County of Seneca v. Cheney,* 12 F.3d 8, 11 (2d Cir.1993).

 The State Defendants claim that the district court erred, because (1) they did not receive a full opportunity for a hearing before the district court; (2) this litigation is barred by *res judicata;* and (3) federal court abstention is appropriate in light of pending state court litigation. In light of our disposition, we do not address the first of these arguments. The third argument is moot, as New York State's highest court has denied leave to appeal in the state court litigation. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (abstention is appropriate when a federal constitutional issue "might" be mooted by a state court determination of pertinent state law); *Turnbow v. Pacific Mut. Life Ins. Co.,* 934 F.2d 1100, 1104 (9th Cir.1991) (abstention issue mooted by decision of state's highest court).

Although the preliminary injunction grants plaintiffs substantially the relief that they sought but failed to obtain in state court (*i.e.,* maintenance of transitional care and TCF), the district court held in both of its decisions that *res judicata* did not apply, because (1) the State had assumed a duty to assist plaintiffs' transition to in-state placement, independent of the TCF Statute; (2) the State Defendants breached this duty by failing to implement the orderly transition of plaintiffs to in-state facilities (most notably in the episode over the Fourth of July weekend); and (3) this breach amounted to a constitutional violation that postdates the State court litigation. 908 F.Supp. at 1156, 908 F.Supp. at 1162.

We agree with the district court that, if plaintiffs had alleged a separate injury by the State Defendants that was subsequent and unrelated to the subject of the State court litigation, and a proper remedy for the separate injury was maintenance of TCF, then *res judicata* would be no bar to the preliminary injunction. However, we conclude that there is no such separate injury for which this injunction is a proper remedy.

## A. *Res Judicata*

Although we are considering the propriety of a preliminary injunction rather than a final determination of the merits, we must evaluate whether and to what extent the doctrine of *res judicata* bars the claims on which the injunction rests.

■ In the *NYCEP* litigation, the New York State Supreme Court held that "neither the TCF Statute, the State constitution, nor the [January 31, 1995 Memorandum of Understanding between the HRA and the OMRDD] entitles the client plaintiffs to City or State [transitional care] funding." *NYCEP v. Pataki,* No. 102684/95, slip op. at 9 (N.Y.Sup.Ct.N.Y.County June 13, 1995). We must accord this state court judgment the preclusive effect that would be given it by the New York courts. 28 U.S.C. § 1738; *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). In New York, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981). It is undisputed that the other requirements of *res judicata* are satisfied: the plaintiffs here sued these defendants in the prior forum, *see* 908 F.Supp. at 1144, n. 2, and the prior forum had the power to grant the relief sought here. *See Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986); *Fay v. South Colonie Central School Dist.,* 802 F.2d 21, 28–29 (2d Cir.1986). The only ground urged by plaintiffs to avoid *res judicata,* as the district court recognized, 908 F.Supp. at 1156, was that some counts in their amended complaint seek injunctive relief in respect of events that postdate the state court proceedings.

■ The first four claims raised in plaintiffs' amended complaint, alleging denial of procedural due process, substantive due process and equal protection, are completely barred by *res judicata,* because the underlying factual predicate for each of these claims—which concern the TCF reimbursement mechanism, the TCF Statute, the City's termination of transitional care, and the plaintiffs' resulting predicament—is substantially identical to the allegations presented in state court. *See Schulz v. Williams,* 44 F.3d 48, 55 (2d Cir.1994) (*res judicata* barred one plaintiff's federal constitutional claims, which could have been raised by that plaintiff in New York state court litigation).

■ Similarly, we conclude that *res judicata* bars plaintiffs' fifth cause of action, which is based on letters to the guardians (1) from the HRA, dated December 7, 1994; (2) from the OMRDD, dated January 11, 1995; and (3) from the OMH, dated February 27, 1995. Plaintiffs claimed that, by virtue of these letters, all defendants assumed a duty to effect orderly transitions into in-state facilities, with "continued" transitional care throughout the transition process, and that this duty was breached "by withdrawal and denial of funding" prior to plaintiffs' orderly transition into appropriate in-state facilities. These facts, however, are part and parcel of the "same transaction or series of transactions" presented to the state court.

The district court, relying on the assurance of "smooth" transfers in the cited correspondence, held that the State "must be estopped from peremptorily removing funding—even if there is no entitlement—without at least following the process it led plaintiffs to expect." 908 F.Supp. at 1152. This estoppel argument could have been made to the state court, because all three of the letters predated the March 31, 1995 filing of the "Restated Verified Complaint" and the "Restated Verified Second Amended Petition" in state court.

We understand the district court's opinion to say that no *res judicata* bar should fall on arguments addressed to the "peremptor[y] remov[al] [of] funding" because the actual termination of funding postdated the state court judgment, and the "peremptor[y]" character of that funding withdrawal could not be anticipated beforehand. Thus, the district court concluded that the plaintiffs' action accrued *after* Justice Freedman issued her opinion on June 13, 1995. The City, however, had already declared its intention to end funding, and the State had already disclaimed entitlement in the categorical language of the TCF Statute, *before* the final state court pleadings were filed. Plaintiffs had every reason to understand that the positions taken by the City and the State would leave them "stranded," *id.* at 1152; indeed, Justice Freedman's opinion anticipated the "abrupt cessation of funding" and

stated that it "may jeopardize the welfare of particularly vulnerable citizens of the State." *NYCEP*, slip op. at 11 (June 13, 1995). In sum, the fifth claim for relief is also barred by *res judicata.*[10]

■ Although not discussed by the district court, we also hold that plaintiffs' ninth claim is barred by *res judicata.* The ninth claim alleges that, "[f]rom and after 11 January 1995, and continuing through the present," OMRDD personnel engaged in "coercive conduct in connection with proposed or nominated transfers," including threats that transitional care would be terminated. Plaintiffs claimed that "[t]his conduct constitutes a separate and distinct violation of constitutional rights by OMRDD." Again, plaintiffs here allege a cause of action on the same set of facts presented before the state court in the prior litigation. This claim that could have been raised in state court is now barred by *res judicata.*

Of the remaining four claims (six through ten), two (eight and ten) seek damages only and do not bear upon this injunction. The sixth was not relied upon by the district court.[11] The court did stress the seventh claim, however, which arises out of the July Fourth weekend episode and therefore pleads events and transactions that postdate the state court proceedings. The court concluded that this claim presented "sufficiently

**10.** Moreover, even if one assumed that a bureaucrat could create an open-ended funding obligation that the legislature disclaims, our review of the correspondence assures us that the State did not mislead the guardians.

The February 27, 1995 letter from the State's OMH to the plaintiffs' guardians lays out in detail a four-step process designed to ensure that plaintiffs and their guardians can prevent an inappropriate or unacceptable in-state placement, and the district court cites these procedures as one foundation for plaintiffs' due process claim. (The January 11, 1995 letter is a similar letter sent by OMRDD to its clients and their guardians.) However, the paragraph that is the preamble to these enumerated procedures makes plain that the State was assuming no obligation to fund out-of-state placements after the City's withdrawal:

> The City HRA has agreed to continue providing [TCF] payments for a short time to enable the orderly transfer of clients seeking placements in publicly funded programs op-

erated or licensed by OMH. *Clients may, of course, choose to remain in their current placement with the cost becoming the responsibility of the client or family.* For those individuals who seek placement in publicly funded programs operated or licensed by OMH, a regulation will be adopted establishing the following process:....

(Emphasis added.) We do not see how the only undertaking in the letter—to afford procedural safeguards against an involuntary transfer to an institution rejected by the guardians—can be transmuted into an entitlement to continued funding for the out-of-state placement.

**11.** The sixth claim alleges that, through correspondence dated on or after June 27, 1995, "[a]ll defendants ratified the assumption of the duty of orderly placement despite withdrawal of funding." Although this claim alleges facts that postdate the state court litigation, our due process analysis below demonstrates that this claim cannot support injunctive relief.

serious questions" on the issue of whether plaintiffs' rights to due process were violated. 908 F.Supp. at 1154. We now address that analysis.

*B. Due Process and the July Fourth Weekend Transfer*

The seventh claim for relief alleges that the State's attempted transfer of certain plaintiffs over the 1995 July Fourth weekend "constitute a separate and distinct violation of constitutional rights by OMH," and demands

mandatory injunctive relief: (a) directing all defendants to restore funding from June 1, 1995, *nunc pro tunc*, at the levels then in place; [and] (b) continuing such order as to each [plaintiff] until a constitutionally appropriate transfer hearing has been held, and an appeal of any determination adverse to the [plaintiff] has been heard and determined in the state courts.

The district court's preliminary injunction affords precisely this relief against the State Defendants. 908 F.Supp. at 1156. The court held that the State Defendants, by their prior actions, had assumed duties under the Due Process Clause to provide professionally adequate in-state placements for plaintiffs, to effect these placements via an orderly transfer, and to conduct the transfer subject to rights of administrative and judicial review. *Id.* at 1152–53. The State Defendants breached this duty during the July Fourth

weekend episode, said the court, by failing to arrange in-state placements and by attempting to move plaintiffs without consent or hearings to unsatisfactory in-state placements. *Id.* The remedy for this breach, according to the court, was (1) to stop all transfers to in-state facilities unless the transfer met due process requirements of adequate care and hearings, and (2) to resume immediately full funding for the plaintiffs' out-of-state care until the appropriate transfers take place. *Id.* at 1153.

■ We conclude, first, that the State Defendants had no duty under the Due Process Clause to provide professionally adequate care to the plaintiffs, and therefore have no duty to resume TCF payments for the plaintiffs' out-of-state care. Second, we conclude that the July Fourth weekend episode amounted to a breach of the State Defendants' duty to ensure that involuntary transfers are constitutionally appropriate, but that this injunction is not the appropriate remedy for this breach.[12]

*1. The Funding Obligation*

After finding state action,[13] the district court held that the State Defendants have a due process obligation under *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982), to exercise "professional judgment" in establishing safe conditions and freedom from undue restraint,

**12.** The doctrine of collateral estoppel does not bar us from considering these federal due process issues. Under New York law, collateral estoppel applies if "[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Kaufman v. Eli Lilly Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63 (1985). Plaintiffs had raised issues of "constitutional rights to procedural and substantive due process" in their Article 78 proceeding to compel administrative hearings, but these issues were not dealt with by the state court either in its April 10, 1995 order (which severed and reserved these issues for "post-hearing Article 78 proceedings") or in its June 13, 1995 disposition of the declaratory judgment action.

**13.** The district court relied on *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97

L.Ed.2d 427 (1987) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)), for the principle that institutionalization amounts to state action for purpose of § 1983 where the government " 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government].' " 908 F.Supp. at 1149. This is problematic because the preliminary injunction runs against the State of New York, whereas it was the City of New York that initially effected the out-of-state placements. The district court, however, gives "primacy" to the role of the State because the State approved out-of-state placements, monitored out-of-state facilities, and in essence is deemed to have caused the out-of-state placement by its failure to find a satisfactory in-state placement. *Id.* at 1150. We accept the idea of state action in this case *arguendo*.

and a duty under *Society for Good Will*, 737 F.2d 1239, 1250 (2d Cir.1984), "to exercise professional judgment in devising programs that seek to allow patients to live as humanely and decently as when they entered the school," and to assure that the "residents maintain the[ir] fundamental self-care skills." *See* 908 F.Supp. at 1150–51.

We conclude that the district court erred in relying upon *Youngberg* and *Society for Good Will*. *Society for Good Will* dealt with the level of care required by the Due Process Clause, but the state's obligation to provide care and funding in that case was undisputed. When, however, the government disclaims any entitlement to continued funding, and then ends this funding, the reach of *Society for Good Will* is controlled by the Supreme Court's subsequent holding in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989): "[T]he Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S.Ct. at 1003. In *DeShaney*, a child who was abused by his father contended that the state social welfare service breached its duty under the Due Process Clause to protect him, because the agencies knew about the danger of abuse "and specifically proclaimed, by word and by deed, its intention to protect him against that danger." *Id.* at 197, 109 S.Ct. at 1004. The issue was whether the State thereby "acquired an affirmative 'duty'" that was "enforceable through the Due Process Clause." *Id.* The Supreme Court rejected this theory of liability: "It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger." *Id.* at 201–02, 109 S.Ct. at 1006. However, "the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202, 109 S.Ct. at 1006.

The Supreme Court did acknowledge that the due process obligation created by cases like *Youngberg*, which involved the security of involuntarily committed mental patients, or *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which involved the provision of medical care to incarcerated prisoners, was still valid, but only as an exception that applied to "certain limited circumstances." *DeShaney*, 489 U.S. at 198, 109 S.Ct. at 1004. The Court explained that these cases "stand only for the proposition that when the State takes a person into its custody and *holds him there against his will*, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. at 1005 (emphasis added). The Court stressed that the involuntary nature of the commitment was determinative:

> The affirmative duty to protect arises *not* from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1005–06 (emphasis added and citation omitted).

Plaintiffs here are under no state-imposed restraint. The whole effort of the guardians, here and in state court, has been to prolong the involvement of the City and the State in the funding of institutional placements as to which the City and the State have washed their hands. *DeShaney* therefore subverts the district court's conclusion that the State Defendants had assumed "by word and by deed," *id.* at 197, 109 S.Ct. at 1004, a duty to provide plaintiffs a smooth and orderly transition to in-state care, including continuous full funding of out-of-state care prior to their

transfer. *DeShaney* flatly rejected as the sole ground for a due process right an expressed intent to provide assistance, or even a failed initiative to do so. *See Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 166–68 (3d Cir.1989) (fact that state had been providing home services to mentally retarded individuals did not create due process right to continued services). Therefore, the injunction cannot be premised on a duty to "exercise professional judgment" under *Youngberg* and *Society for Good Will,* because there is no such duty here.

### 2. July Fourth Weekend Transfer

■ The district court outlined in some detail "OMH's precipitate actions" in the abortive transfer of nine individuals from the Devereux Institute over the July Fourth weekend. *See* 908 F.Supp. at 1148–49 & n. 13. Boiled down, the district court's findings demonstrate that some or all of these individuals were incapable of giving their consent to being moved from the institute, and that the OMH attempted to transfer them involuntarily to another institution, without the consent of their guardians.

■ An attempt by the State to force involuntary commitment to an institution or to otherwise involuntarily restrain an individual implicates at least an individual's right to procedural due process. *See Jones v. United States,* 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983) ("It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.") (internal quotation omitted). By attempting to seize and transport plaintiffs to in-state institutions without the consent of their guardians and without providing adequate procedural due process guarantees, the State Defendants threatened a violation of plaintiffs' due process rights. The question is, what remedy is appropriate for this wrong?

The injunction has two remedial elements: (i) resumption of full funding of plaintiffs' out-of-state care; and, (ii) when or if plaintiffs are transferred to in-state facilities, compliance with an "orderly" transfer process that includes procedural due process guarantees.

■ *(i) Funding.* The due process right against deprivation of liberty, implicated by the attempted July Fourth weekend transfer, is distinct from an asserted right to receive voluntary institutional care from the State, implicated by the termination of funding. As we have already discussed, under *DeShaney,* plaintiffs have no independent due process right to funded care from the State Defendants. The district court addressed this issue by engrafting the involuntary character of the attempted transfer onto the overall institutional status of the plaintiffs. It therefore concluded that the due process obligation restricting involuntary transfers automatically created a due process obligation to fund the plaintiffs' current institutional placements. 908 F.Supp. at 1153. But the loss of funding for voluntary private institutional care does not restrict plaintiffs' liberty (and does not implicate the Due Process Clause) as would an involuntary transfer. *See DeShaney,* 489 U.S. at 196–97, 109 S.Ct. at 1003–04. A due process violation was threatened during the July Fourth weekend, but that wrong cannot support an injunction that imposes an expansive duty for the State Defendants to provide immediate full funding. The district court lacked the power to deploy the State's resources in this way. Injunctive relief should be "narrowly tailored" to address specific harms and "not impose unnecessary burdens on lawful activity." *Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994) (citing *Society for Good Will,* 737 F.2d at 1251).

■ *(ii) Transfer Process.* The injunctive requirement that the transfer process must be "orderly" and constitutionally appropriate could be supported only to the extent that a transfer is involuntary, as was the transfer attempted over the July Fourth weekend. We do not doubt that, if the district court had found an "actual and imminent" likelihood of future abuses similar to the July Fourth weekend episode, the district court could remedy it by injunction. *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995). But the district court made no such finding. At

most, the district court found that cessation of TCF "will *inevitably*" force the State to make "a hasty transfer" of plaintiffs, 908 F.Supp. at 1155 (emphasis added); but this conclusory statement is unsupported. There is no finding whatsoever of any "actual and imminent" threat that the State will renew its attempt to effect an involuntary transfer. The extraordinary remedy of an injunction is unavailable absent such a finding. Nor does the cessation of transitional care "inevitably" mean "hasty transfer[s]" by the State, because the State's disclaimer of any funding obligation until 1999 does not require the relocation of any of its clients. We therefore conclude that this injunction is not needed to prevent irreparable harm that may result from the threatened violation of plaintiffs' rights over the July Fourth weekend, or that might flow from any similar incident in the future.

### CONCLUSION

For the reasons set forth above, we vacate the preliminary injunction and remand.

PARKER, Circuit Judge, dissenting:

I do not agree that Judge Trager abused his discretion in granting the preliminary injunction.

The plaintiffs, who were placed as children, are sufficiently disabled that they have no ability to care for themselves, nor do they have any ability to choose what their living and care arrangements should be. Beginning in 1982, the plaintiffs turned twenty-one and "aged out" of their federally-funded educational program. The counties and localities, which originally placed the plaintiffs with State approval in out-of-state facilities, decided to continue their placement out-of-state because there was a shortage of in-state facilities. At that time, the State chose to bear 50% of the cost of care.

The plaintiffs, as adults, came under State supervision either through the New York State Office for Mental Retardation and Developmental Disabilities ("OMRDD") or through the New York State Office of Mental Hygiene ("OMH"), which were required to arrange for their transfer [1] to appropriate in-state adult care facilities. Those State offices, however, did little to arrange the transfers, apparently because in-state facilities were not available.

In 1994, transfer procedures and funding were codified in the Transitional Care Funding ("TCF") statute. N.Y.Soc.Serv.L. §§ 466 to 466–b (McKinney Supp.1996). Pursuant to the TCF statute, § 466, the State agreed to increase its share of the cost of care from 50% to 60% for the period 1995 to 1999 and agreed to assume 100% of the cost thereafter. Despite the increased State funding, in the fall of 1994, New York City decided to cut off funding after 1994. The City later extended funding through the first half of 1995.

While the State does not have a statutory obligation to continue funding the out-of-state services, it does have a statutory obligation to provide in-state services and to transfer the plaintiffs to those services.[2]

---

1. *See* N.Y.Soc.Serv.Law § 473(1) (McKinney Supp.1996) (quoted at *infra* n. 2). This statute has been in effect since 1975.

2. Section 473 of the New York Social Service Law provides:
 1. In addition to services provided by social service officials pursuant to other provisions of this chapter, such officials *shall provide protective services* in accordance with federal and state regulations to or for individuals without regard to income who, because of mental or physical impairments, are unable to manage their own resources, carry out the activities of daily living, or protect themselves from ... active, passive or self neglect ... or other hazardous situations without assistance from others and have no one available who is willing and able to assist them responsibly. Such services shall include:
 . . . .
 (c) arranging, when necessary, for commitment, guardianship, or other protective placement of such individuals either directly or through referral to another appropriate agency, provided, however, that where possible, the least restrictive of these measures shall be employed before more restrictive controls are imposed;
 (d) providing services to assist such individuals to move from situations which are, or are likely to become, hazardous to their health and well being....
 N.Y.Soc.Serv.Law. § 473 (emphasis added).

Furthermore, as provided by the TCF statute, the State has promulgated procedures to place plaintiffs responsibly in in-state facilities while out-of-state care is phased out.[3]

The State agencies were aware of their obligation to place these individuals in facilities located in New York State, but failed to do so. This gave rise to the fiasco of the weekend of July 4, 1995. With no notice to the patients, or their guardians, and with only three days notice to the care facilities, the State attempted to pick up these individuals and involuntarily transfer them into facilities in New York State. There was no suggestion that any orderly transition would be forthcoming, or that any modicum of professional judgment would be exercised to determine the appropriateness of the transfers or the transferee facilities. This all occurred despite earlier representations from OMRDD and OMH that transitional care payments would be made to support the "orderly transfer of clients," and a June 27, 1995 letter from Governor Pataki indicating that these individuals would be "offered appropriate placements, assimilating into the adult care system...."

Against this factual background, I cannot agree that the plaintiffs' substantive due process claim is barred in any way either by *res judicata* or by the holding of *DeShaney v. Winnebago County Dep't. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

With regard to *res judicata*, during the pendency of the New York State litigation, various State officials represented that an orderly transition from out-of-state to in-state facilities would be made. In the face of those representations, plaintiffs should not be expected to have anticipated an abrupt

funding cutoff. Nor could plaintiffs have anticipated an inhumane attempt to transfer as the State attempted to do on July 3, 1995, after the New York State litigation was complete.

Nor am I persuaded by the majority's reliance on the Supreme Court's decision in *DeShaney*. In *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982), the Supreme Court held that the Due Process Clause requires the State to provide adequate food, shelter, clothing, medical care, personal security, protection from arbitrary restraint and certain minimum services to persons who are in State care. In fulfilling those obligations, the State is given great deference so long as it determines the level of appropriate service by an exercise of professional judgment. *Id.* at 321–23, 102 S.Ct. at 2461–62. *Youngberg*, of course, involved an involuntary commitment of a mentally disabled person. This court's holding in *Society For Good Will To Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1245–47 (2d Cir.1984) ("*Good Will*"), was not so limited. That case dealt with the due process rights of mentally disabled residents of a State-operated school. Without deciding whether the residents were voluntarily or involuntarily admitted to the school, the court found the residents to be dependent upon the State. On the basis of their dependency, the court explained that the State had a duty to house them in a manner which does not deprive them of due process. The State was required to exercise professional judgment in determining appropriate care. *Id. Youngberg* and *Good Will* recognize a basic due process right to humane treatment while in state care.

. . . .

**3.** The TCF statute provides:

5. Social services districts shall discontinue payments for transitional care, in accordance with procedures established by the department, for any individual:

(a) who has been offered an appropriate, available adult placement or adult services, based upon a notification from the department that such an offer has been made and accepted, or has been made and upheld by an administrative hearing, or has been made and the time to request an administrative appeal has expired;

(c) who is residing in a facility which has failed or refused to meet its obligations pursuant to this article as a condition of funding, based on a notice from the department that it has made such a determination and that the office of mental health or the office of mental retardation and developmental disabilities, if necessary and appropriate, offer an adult placement to the individual on an expedited basis.

N.Y.Soc.Serv.Law § 466.

Although *DeShaney* may have limited *Good Will* to some extent, I do not believe that *DeShaney* in any way overruled *Good Will*. In *DeShaney* a minor child, Joshua DeShaney, sought to hold state social workers liable under the Due Process Clause for having failed to protect him from abuse by his father who had custody. *DeShaney* simply held that the Due Process Clause does not require the State to protect a person who is not in State custody from acts of private persons. The Court relied on the fact that the Due Process Clause protects people from state action, not private actions.

In *DeShaney* the Court also noted:

Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to *Estelle* [*v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (requiring States to provide adequate medical care to prisoners)] and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. We express no view on the validity of this analogy, however, as it is not before us in the present case.

489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9 (citations omitted). The plaintiffs here, as in *Good Will*, receive their care as a result of state action and hence fall closer to the foster care analogy, which *DeShaney* explicitly declined to reach, than to the private action from which the Court in *DeShaney* held no due process rights arise. Accordingly, *DeShaney* does not undermine the holding of *Good Will*: that due process requires that mentally disabled persons who are dependent on the State for their care must receive treatment in accordance with standards of professional judgment.

In *DeShaney*, the Court stressed that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. at 1006. In the instant case, however, the district court found that for many plaintiffs "the State is de facto, if not de jure, guardian." 908 F.Supp. 1142, 1149 (E.D.N.Y.1995). The plaintiffs are adult people who have been living in out-of-state facilities approved, supervised and funded in part by the State. Given this factual scenario, I cannot agree that the district court abused its discretion when it found that these plaintiffs are in the custody of the State for purposes of effecting an orderly transfer to in-state facilities.

Plaintiffs have a due process right to a minimal degree of care based upon professional judgment. This conclusion stems from several factors, including: plaintiffs' previously created dependence upon the State; plaintiffs' inability to make basic decisions for themselves, or to care for themselves; and the State's unfulfilled obligation to provide in-state care for the plaintiffs.

We should not disturb Judge Trager's conclusions that there are sufficiently serious questions regarding the risk of further abuse of the plaintiffs' substantive due process rights, and that the balance of hardships tips decidedly in plaintiffs' favor.[4] These plaintiffs are particularly vulnerable to change. The actions of the State over the weekend of July 4, 1995, demonstrate that these plaintiffs can be substantially harmed by State action—namely, attempts to transfer the plaintiffs without adequately considering the appropriateness of the means of transfer, or of the facilities to which the transfer occurs.

Given the responsibility of the State to provide minimal care and not to inflict the harm that a disorderly transition could cause, it is hardly a stretch to conclude that there was an attempt to violate plaintiffs' substan-

---

**4.** The district court did not need to find an "actual and imminent" likelihood of future abuses involving the threat of involuntary transfer, though the majority suggests it must at 31–32. As the majority correctly noted at 18, the court only needed to find "sufficiently serious ques-

tions" of such abuses given a balance of hardships that tips "decidedly" in the plaintiffs' favor. We should not forget this alternative ground for granting a preliminary injunction, particularly since it is the ground relied on by the district court, 908 F.Supp. at 1154.

tive due process rights. Without injunctive relief, the State may violate the due process rights of these plaintiffs in the future. It is hardly an answer to suggest, as the majority does, that a more limited injunction (presumably an order not to repeat the events of the July Fourth weekend) will suffice. If funding is cut off, an orderly transition cannot occur because any additional attempts by the State to move the plaintiffs will again be forced by the threat of eviction rather than determined by the medical needs of the plaintiffs and the capabilities of available in-state-facilities. There is substantial risk that hasty decisions made under the threat of eviction will result in ill-considered, poorly executed in-state placements that endanger the health of the plaintiffs. This risk is particularly acute given the continuing dearth of in-state-facilities capable of adequately caring for the plaintiffs, a dearth that has persisted for more than a decade and that is unlikely to end before the out-of-state facilities run out of funds to care for the plaintiffs.

The district court's decision to order the State to fund transitional care was not an abuse of discretion. I respectfully dissent.