OPINION OF THE COURT
 

 Wesley, J.
 

 The issue on this appeal is whether Social Services Law § 466
 
 *300
 
 prohibits the City of New York from withdrawing from the State’s transitional care funding program. We conclude that the City’s participation in the transitional care funding program is voluntary, and therefore it is not prohibited from withdrawing from the program.
 

 Petitioner, Judge Rotenberg Educational Center, operates a residential school in Rhode Island for severely disabled children. Petitioner commenced this CPLR article 78 proceeding to compel respondent to continue to pay for the care of eight severely disabled young adults who were placed there by the City when they were children. Petitioner contends that the City cannot withdraw from the funding program that pays for the care of the eight adults in question without complying with the administrative procedures set forth in Social Services Law § 466 (5). The City argues that, under the statute, its participation in the funding program is optional, and therefore it is free to withdraw from the program.
 

 Supreme Court dismissed the petition. The court held that the City was not obligated to provide transitional care funding under Social Services Law § 466, and therefore petitioner’s claim for payment was unavailing. The Appellate Division affirmed (230 AD2d 278).
 
 [1]
 
 The Appellate Division held that "although social service[s] districts have the discretion to expend funds to provide transitional care, they are by no means required to do so.” The Appellate Division also held that since the City had lawfully withdrawn from the transitional care funding program, it was not required to comply with the administrative procedures in Social Services Law § 466 (5). We granted petitioner’s motion for leave to appeal, and we affirm.
 

 I.
 

 Under Federal and State law, disabled children in New York are entitled to a free and appropriate education
 
 (see,
 
 Individuals with Disabilities Education Act, 20 USC 1400
 
 et seq.;
 
 Educa
 
 *301
 
 tion Law §§ 4001-4006, 4401-4410). Most disabled children in New York receive their education in-State. For some severely disabled children, however, appropriate facilities are not available in New York. For those children localities must contract with appropriate residential facilities in other States to meet the child’s specific needs
 
 (see,
 
 Education Law § 4002 [1]; § 4407 [1] [a]). Even though these children are placed in out-of-State facilities, Federal and State funds remain available for their education and care. However, funding ends when a disabled child reaches 21 and "ages out” of the programs.
 

 "Aged out” individuals are entitled to receive free adult care
 
 in New York
 
 from the State Office of Mental Retardation and Developmental Disabilities (OMRDD) and the State Office of Mental Health (OMH). Often, however, severely disabled young adults cannot return to New York because suitable adult care placements are not available here. As a result, these individuals are left at out-of-State facilities with no guaranteed source of funding.
 

 In 1982, as a temporary solution to this problem, the State created the transitional care funding program in the appropriation language in the annual Aid to Localities Budget
 
 (see,
 
 Budget Report by Assemblyman Sanders, Bill Jacket, L 1994, ch 600). Under this program, the localities paid for the cost of caring for disabled young adults, and the State reimbursed the localities for 50% of the cost. Initially, the program was only intended to provide short-term funding until appropriate adult care placements became available in-State. The State, however, failed to assure transition for many disabled young adults to in-State placements, and the funding program became a long-term effort. From 1982 to 1994, the State’s Aid to Localities Budget continued to contain earmarked appropriations to reimburse localities for 50% of their cost.
 
 [2]
 
 Throughout this time there was no corresponding authority for the transitional care program in substantive law.
 

 Then, in July 1994, the Legislature enacted a comprehensive statute devoted specifically to transitional care (L 1994, ch 600). The statute authorized the continuation of the transitional care funding program. However, it also shifted primary responsibility for the program to the State, and provided for the eventual phase-out of the program. Under the statute, the
 
 *302
 
 Legislature: (1) increased the State’s reimbursement to localities from 50% to 60%; (2) directed OMRDD and OMH to begin transferring all persons in out-of-State facilities to appropriate in-State facilities; (3) mandated that individuals be afforded an administrative hearing to contest the appropriateness of a proposed placement; and (4) provided that, beginning in 1999, the State would be responsible for 100% of the cost for all persons who remained in out-of-State facilities.
 

 The statute had an effective date of January 1, 1995. On October 25, 1994, the City announced that it was withdrawing from the transitional care funding program, and on December 7, 1994, notified petitioner of its pending withdrawal. In its letter of withdrawal, the City stated that the State was responsible for providing specialized care for mentally disabled adults, and that the City could no longer carry this burden for the State. On January 31, 1995, one day before the scheduled cutoff, the City and the State entered into a memorandum of understanding. The City agreed to provide $1,116 million for transitional care until the allotted funds ran out, or until June 30, 1995, whichever came first. The memorandum of understanding expressly recognized that the transitional care funding program was an optional program from which the City could opt out at any time. The allotted funds were exhausted on May 31, 1995, at which time the City stopped providing funding.
 
 [3]
 

 At the time that funding was cut, the Rotenberg Center was providing care to eight severely disabled young adults, who had been placed with it as children, had "aged out” of the educational programs, and had been receiving transitional care support from the City. From June 1, 1995 to November 16, 1995, petitioner continued providing care to these individuals without payment. On November 16, 1995, the State assumed full responsibility for the cost of caring for these individuals. Petitioner now seeks payment for the 51/2-month period it provided care without payment.
 
 [4]
 

 
 *303
 
 II.
 

 Section 466 of the Social Services Law provides in pertinent part that: "Social service[s] districts
 
 may
 
 expend funds to provide transitional care as described in this section. Approved expenditures for transitional care by social services districts * * * shall be subject to state reimbursement at the rate of sixty per centum” (Social Services Law § 466 [2] [emphasis added]).
 

 " 'It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature, and where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used’ ”
 
 (Doctors Council v New York City Employees’ Retirement Sys.,
 
 71 NY2d 669, 674-675;
 
 Patrolmen’s Benevolent Assn. v City of New York,
 
 41 NY2d 205, 208). The only reasonable interpretation of Social Services Law § 466 (2) is that localities are not required to participate in the transitional care funding program. If participation in the program is voluntary, it would necessarily follow that withdrawal from the program is also a matter of local prerogative. Nonetheless, petitioner argues that permitting the City to withdraw from the transitional care funding program is contrary to the legislative scheme and intent of Social Services Law § 466. We disagree.
 

 The legislative history of this statute reveals that the transitional care funding program has always been a voluntary program for localities (see, Budget Report by Assemblyman Sanders, Bill Jacket, L 1994, ch 600). The Legislature was aware that some localities had already withdrawn from the program, and that many more were threatening to withdraw
 
 (see,
 
 Mem of State Exec Dept, 1994 McKinney’s Session Laws of NY, at 2791). The Legislature’s response was not to lock localities into the program, but rather to shift more responsibility to the State and to move toward the eventual phase-out of local expenditures for transitional care. While the Legislature expected that localities would remain in the program until
 
 *304
 
 1999, both the language and history of the statute demonstrate that localities were free to withdraw if they so desired.
 
 [5]
 

 Petitioner also argues that respondent could not cease funding without complying with the administrative procedures set forth in Social Services Law § 466 (5). We disagree.
 

 Section 466 (5) provides in pertinent part that: "Social services districts shall discontinue payments for transitional care, in accordance with procedures established by the department, for any individual: "(a) who has been offered an appropriate, available adult placement or adult services, based upon a notification from the department that such an offer has been made and accepted, or has been made and upheld by an administrative hearing, or has been made and the time to request an administrative hearing has expired” (Social Services Law § 466 [5]).
 

 To make sense of this provision, it must be read in conjunction with sections 7.38 and 13.38 of the Mental Hygiene Law, also enacted as part of chapter 600 of the Laws of 1994. These sections provide that, when OMRDD or OMH offer an in-State placement to an individual receiving transitional care, that individual must be afforded an administrative appeal to review the appropriateness of the proposed placement
 
 (see,
 
 Mental Hygiene Law § 7.38 [e]; § 13.38 [e]). These sections set forth the procedural rights of an individual receiving transitional care. Section 466 (5) merely provides that, where an individual has been offered an in-State placement and the individual’s procedural rights have been exhausted or waived, then the locality must stop making payments for that individual. Section 466 (5) provides a mechanism to terminate payments by a participating locality; it does not define a substantive right to locally funded transitional care.
 

 Furthermore, if we were to accept petitioner’s reading of section 466 (5), the statute would afford every individual currently
 
 *305
 
 receiving transitional care a right to continued funding until an appropriate placement is made available. However, the statute makes clear that it creates no such right. Section 16 of chapter 600 plainly provides that: "[n]o provision of this act shall be deemed or construed to create any right, interest or entitlement for any individual to receive mental hygiene, education or social service funds or services, or placement in a mental hygiene facility, or any other right, interest or entitlement to services, funds or placement” (L 1994, ch 600, § 16).
 

 The purpose and intent of the statute are clear: the City’s participation in the transitional care program is voluntary. Its withdrawal from the program was not limited by the statute.
 
 [6]
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . Petitioner also named the State as a respondent in the proceeding. Supreme Court dismissed the petition with regard to the State and the Appellate Division affirmed that part of the order. The Appellate Division noted that the State had no independent obligation to pay petitioner for the care of the eight young adults in question. "Rather, at the current time, the State’s liability derives from and is solely dependent upon the social services district’s voluntary determination to provide transitional care funding” (230 AD2d 278, 281). Petitioner sought to appeal the Appellate Division’s order with regard to both the State and the City. However, the motion for leave to appeal with regard to the State was untimely and was dismissed (90 NY2d 932). Accordingly, the State is not a party to this appeal.
 

 [2]
 

 .
 
 In 1982, the total cost of the program was $350,000. By 1994, the cost had increased to $26 million (Mem of State Exec Dept, 1994 McKinney’s Session Laws of NY, at 2791).
 

 [3]
 

 . Suffolk and Westchester Counties also withdrew from transitional care funding at about the same time.
 

 [4]
 

 . As Supreme Court noted, this case involves only petitioner’s claim for payment, and not any constitutional or statutory rights of the eight disabled individuals in petitioner’s care. Other actions have been brought on behalf of the disabled individuals
 
 (see, Brooks v Giuliani,
 
 84 F3d 1454 [2d Cir],
 
 cert denied sub nom. Brooks v Pataki,
 
 519 US 992;
 
 New York Council for Exceptional People v Pataki,
 
 220 AD2d 236,
 
 Iv denied
 
 87 NY2d 809). When the State assumed 100% of the cost of the care for these individuals on November 16, 1995, it was acting pursuant to a preliminary injunction which the parents and
 
 *303
 
 guardians of the disabled individuals had obtained in Federal court. Although the State obtained a reversal of the preliminary injunction on appeal, the parents and guardians subsequently obtained a stay of that reversal. The State did not oppose the stay application, and continued to pay for the care of the disabled individuals (Governor’s Veto Mem No. 77,1996 NY Legis Ann, at 609).
 

 [5]
 

 . The Legislature in recognition of the plight of the adults from localities that had withdrawn from the program, attempted to accelerate the State takeover of funding transitional care in 1996 by passing legislation that would require full State funding as of September 1, 1996 (1996 NY Senate-Assembly Bill S 6096, A 8698). The Governor vetoed the bill because it suffered from a serious technical defect: it provided full State funding only to localities that were participating in the program as of September 1, 1996. Thus, the bill would not address the problem it attempted to solve (Governor’s Veto Mem No. 77, 1996 NY Legis Ann, at 608). If the Legislature had intended to indicate that participation in transitional care was mandatory, this legislation would have been the perfect opportunity to do so. It would have also cured the defect that caused the bill’s demise.
 

 [6]
 

 . It bears noting that the number of adults in this public policy quagmire has been significantly reduced by newly constructed State facilities and the State’s compliance with the Federal court order noted earlier.